MICHAEL G. HILBORN AND HELENE A. HILBORN,
PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 10246–83.    Filed November 5, 1985.

*Fred R. Harbecke*, for the petitioners.
*John T. Lortie* and *Thomas C. Borders*, for the respondent.

NIMS, *Judge*: Respondent determined a deficiency of $1,690.64 in petitioners' 1979 Federal income tax.

After concessions, the issue for decision is the fair market value of an historical facade donated to the Vieux Carre Commission of New Orleans by a limited partnership pursuant to a servitude agreement under Louisiana law.

## FINDINGS OF FACT

Certain facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Michael G. and Helene A. Hilborn (husband and wife, hereinafter sometimes referred to as petitioners) resided in Deerfield, Illinois, at the time of filing the petition herein. Petitioners are indirectly limited partners in St. Louis Partners, Ltd. (St. Louis Partners). They acquired their interest in St. Louis Partners through R & H Partners, an Illinois general partnership, of which petitioners are equal partners with Oscar Reid. R & H Partners has a 2.828-percent interest in St. Louis Partners. As 50-percent partners of R & H Partners, petitioners claimed their allowable share of losses, deductions, and credits from St. Louis Partners.

St. Louis Partners is a limited partnership with three general partners: John Nedeau, Richard Schanhals, and Bernard Wiczer (Wiczer). The purpose of the partnership was to

acquire, rehabilitate, hold for investment, and operate an apartment building located at 835 St. Louis Street, New Orleans, Louisiana (the building).

The property is located on St. Louis Street near the middle of the French Quarter (Vieux Carre) of New Orleans which is a registered historic district. The French Quarter is approximately 13 blocks long and 6 blocks wide. It is bounded by the Mississippi River, Canal Street, North Rampart Street, and Esplanade Avenue. The building is situated in the square bounded by St. Louis Street, Toulouse Street, Bourbon Street, and Dauphine Street. The building is a 3½-story masonry townhouse with an attached 3-story slave quarter in the rear. At the time of the trial of this case, the building was not listed in the National Register of Historic Places in Washington, D.C., and had not been certified by the Secretary of the Interior as being of historic significance to the Vieux Carre historic district.

The property is zoned VCR-1 (Vieux Carre Residential). At the time of the facade donation, the density allowed, and the open space required, by the zoning ordinance were 3 units and 975.6 square feet, respectively. There existed at the time of donation 10 apartment units, which were later converted into 9 condominium units and 674.25 square feet of open space.

The zoning ordinance also provides in pertinent part as follows:

No occupancy permit shall be issued by the Director, Safety and Permits, for any change in the use of any existing building until and unless a special permit shall have been issued by the Vieux Carre Commission, except that where no change of exterior appearance is contemplated such permit by the Vieux Carre Commission shall not be required. Where any change in exterior appearance is contemplated, the Vieux Carre Commission shall hold a hearing, and if it approves such change, it shall issue a special permit to continue the same use, or for any other use not otherwise prohibited in this District, subject to the following conditions and safeguards:

a. The historic character of the Vieux Carre shall not be injuriously affected.

b. Signs which are garish or otherwise out of keeping with the character of the Vieux Carre shall not be permitted.

c. Building designs shall be in harmony with the traditional architectural character of the Vieux Carre.

d. The value of the Vieux Carre as a place of unique interest and character shall not be impaired.

The Vieux Carre Commission (VCC) was created by an amendment to the Louisiana Constitution in 1936. Its purpose is stated in section 65–6, chapter 65, City Code of New Orleans, as follows:

> The Vieux Carre shall have for its purpose the preservation of such buildings in the Vieux Carre section of the city as, in the opinion of the Commission, shall have architectural and historical value and which should be preserved for the benefit of the people of the city and State.

Thus, the VCC is charged by the Louisiana Constitution and the Code of the City of New Orleans with the duty of preserving the historic character of buildings located in the French Quarter. The VCC is an organization described in section 170(c)(1).[1]

All buildings and structures fronting streets or alleys located within the Vieux Carre section of New Orleans are subject to the jurisdiction of the VCC. Before a property owner can perform any renovations to the exterior facade of a building in the Vieux Carre section, the owner must apply to the VCC for a permit. When applying for a permit, a property owner must submit plans and specifications of the proposed renovation to the VCC. The VCC has authority to specify any reasonable change to the proposed plans necessary to preserve the historic and architectural character of the building.

The written policy of the VCC, as adopted on December 4, 1979, with respect to facade donations, is as follows:

### FACADE EASEMENT POLICY

When the United States Congress enacted the 1976 Tax Reform Act legislation, which allowed for accelerated amoritization of rehabilitation costs on buildings of historic and architectural significance, it mandated procedures for both Certification of the building and any rehabilitation. Rules known as "The Secretary of the Interior's Standards for Rehabilitation" were adopted and tax benefits accrued only to those applicants who followed these preservation guidelines. The purpose is to protect the facade of historically important buildings for the public while allowing the owner a tax advantage for that which he gives to the public.

However, a prospective facade donor *does not* have to have his building certified prior to making a donation for tax purposes. Although the building

---

[1]Except as specifically otherwise noted, section references are to the Internal Revenue Code of 1954 in effect for 1979. All Rule references are to the Tax Court Rules of Practice and Procedure.

must be of architectural or historical importance, no formal standards have been adopted.

The standards for accepting facade donations as set forth in the VCC's Facade Easement Policy are as follows:

Buildings located in the Vieux Carre can be considered differently. The public interest is protected to a large degree because the buildings and their existing facades are already protected by law. Therefore, a greater standard can and should be applied to a structure which applies for a facade donation. That greater standard should require restoration to prevent deterioration and to restore the building architecturally, if necessary, to a standard acceptable to the Vieux Carre Commission. Additionally, nonconforming (yet legal because they existed over two (2) years) uses, signs, or additions found to be obnoxious may be required to be eliminated. The degree of restoration will be determined by the Vieux Carre Commission on a case-by-case basis.

Thus, it was the policy of the VCC in 1979 to accept the donation of the facade of any structure in the Vieux Carre which had been historically and architecturally restored to a degree acceptable to the commission or to accept the facade donation where the plans for restoration had been approved by the commission and the work had been guaranteed by the donor.

On October 10, 1979, Wiczer, acting on behalf of St. Louis Partners, entered into a purchase agreement to acquire the building for $300,000 from a group of individuals, one of whom was Neville Landry (Landry). Landry at some time also became a limited partner in St. Louis Partners. The closing took place on November 30, 1979.

At the time of acquisition, the building was vacant and partially gutted. The $300,000 purchase price consisted of (1) an earnest money deposit of $10,000, (2) $20,000 cash at closing, (3) $30,000 cash to be paid by March 1, 1980, evidenced by a promissory note bearing 11½-percent interest, and (4) a $240,000 wraparound, nonrecourse mortgage to the seller. The contract of purchase was conditioned upon the VCC agreeing to accept a donation of the building's facade, pursuant to section 170(f)(3)(C), and the qualification of the building as a historical landmark on the Federal Register. In addition, St. Louis Partners was obligated under the contract to perform rehabilitation of the building, exclusive of facade repairs, for an amount not to exceed $185,000.

To ensure that adequate funds would be available to meet the $185,000 renovation obligation, the contract called for the establishment of an escrow fund. St. Louis Partners was required to deposit $80,000 at the time of closing with Landry Title Insurance, Inc., escrowee for the partners. Rather than naming Landry Title Insurance, Inc., as escrowee, St. Louis Partners on November 30, 1979, deposited $80,000 into account number 01–36314–2 at National American Bank of New Orleans. Wiczer and Landry were joint signatories on the account.

On December 4, 1979, the VCC voted unanimously to accept the facade donation subject to the donor's compliance with 23 recommendations written by the VCC staff and approval by the VCC of three sets of drawings (plans and elevations) incorporating the recommendations. The staff's recommendations, revised on December 7, 1979, were as follows:[2]

MAIN BUILDING

1. Repairs of front entrance and door millwork.
2. Restoration of e isting wood alley gate.
3. Repair and replacement of gallery decking, soffits, and fascia boards on front facade as required to match e isting.
4. Cleaning and painting of e isting decorative ironwork on front facade.
5. Replacement of missing shutters and repair of e isting shutters as required on front facade.
6. Removal of e isting vegetation on front parapet and correction of sustaining growth condition.
7. Replacement of missing iron grille near grade on rear facade.
8. Replacement of doors and windows on rear facade with casement and paneled millwork.
9. Tuck-pointing and plastering as required on front and rear facades.
10. Painting of front, rear, and slave quarter millwork.
11. Repair of existing plaster in pedestrian alley.
12. Installation of new meter enclosure in pedestrian alley.
13. Replacement of deteriorated gutters, downspouts, and scuppers.
14. Removal of existing loose wiring and conduit.

SLAVE QUARTERS

1. Repair and/or replacement of existing balcony decking, railings, and balusters.
2. Rebuilding of existing rear stair structure, changing the direction of the first flight.
3. Repair of existing front and rear stairways.

---

[2]The VCC staff recommendations as revised contain only 22 conditions of acceptance. The record does not reveal which one of the original 23 was deleted.

4. Restoration of existing door and/or window millwork.

5. Restoration of formerly-existing tongue and groove diagonal beaded board panel on ground floor to match existing.

6. Removal of existing screen doors and windows.

7. Removal of existing brick planters and planting strips in courtyard.

8. Patching of deteriorated flagstone paving in courtyard to match existing.

On December 28, 1979, St. Louis Partners entered into a servitude agreement with the VCC consisting of two documents. The agreement created a perpetual servitude on the real property which qualifies as a charitable contribution under section 170(c). A "servitude," which is a Louisiana law concept, is sufficiently analogous to an easement to permit the use of the two terms interchangeably for purposes of this case. The servitude agreement provided that certain repairs and renovations to the exterior facade of the building costing approximately $47,800 were to be made by St. Louis Partners as a condition of the VCC's acceptance of the servitude donation.

The first document, entitled "SERVITUDE," provides in pertinent part as follows:

Grantor desires and intends and by these presents does create and establish in perpetuity, a real servitude in, over and to the exterior facade, front and roof of the above described property and the buildings and improvements located thereon, and by these presents does grant, convey and transfer in perpetuity unto Grantee, the said real servitude of the said exterior facade, front and roof of the above described property and the buildings and improvements located thereon. This real servitude shall be limited to, and shall hereinafter give Grantee, the sole right at Grantee's own discretion to preserve or maintain in its present condition (including those requirements set forth in the minutes of the meeting of the Vieux Carre Commission of December 4, 1979, the appearance, composition and/or character of the said exterior facade, front or roof of the above described property and the buildings and improvements located thereon, and/or the sole right at Grantee's own discretion to require Grantor at Grantor's sole cost and expense, to perform and conduct such work deemed necessary by Grantee in Grantee's sole discretion in order to preserve.or maintain in its present condition (including those requirements set forth in the minutes of the meeting of the Vieux Carre Commission of December 4, 1979) the appearance, composition and/or character of the said exterior facade, front or roof of the above described property and the buildings and improvements located thereon. Grantee shall also have the right of ingress to and egress from any portion of the above described property, for the purposes and benefits of this servitude, and in all respects shall have such access to the

above described property as is necessary to exercise any rights granted herein by the Grantor. Grantor shall have the right to use the above described property, including the exterior facade, front and roof which forms the subject of this servitude, for whatever lawful purpose Grantor deems necessary, except as to the rights of servitude herein granted, and agrees not to disturb Grantee in the exercise of any rights granted herein. Grantor must first obtain Grantee's written approval of and consent to any change, alteration, renovation, or improvement of, in or to the said exterior facade, front or roof before commencing such work. All work for preserving or maintaining the said exterior facade, front or roof, as may be recommended, required and/or approved by Grantee, shall be performed and conducted by Grantor at Grantor's sole cost and expense.

The second document, entitled "AGREEMENT," provides in pertinent part as follows:

1. Owner shall perform certain work to the above described property in accordance with the plans and specifications attached hereto and made a part hereof and marked Exhibit "B", which said work is fully described in the contract by and between St. Louis Partners, Ltd. and Herman Construction dated December 28, 1979, a copy of which is annexed hereto and marked Exhibit "C".

2. The work to be performed by Owner as shown in Exhibit "C" shall be done at Owners' sole cost and expense and shall be completed prior to May 31, 1980.

3. The Commission shall have the right to inspect Owners' work as it progresses and when it is completed and the Commission may require any changes or corrections in said work that is/are not completed pursuant to Exhibit "B".

4. Owner shall deposit the sum of Forty Seven Thousand Seven Hundred Eighty (47,780.00) Dollars in the National American Bank in New Orleans to cover the expenses of the renovation work set forth in Exhibit "B" which is the work that forms the basis of the Herman Construction contract, marked Exhibit "C", which funds shall be paid out as hereinafter provided:

(a) The sum of $4,778.00 on commencement of work;

(b) The balance shall be paid in part by part, progressively, as the work is accomplished until the full sum of $38,224.00 is paid: and

(c) The remaining $4,778.00 shall be paid when the total job is completed and approved by the Commission.

5. Other than the initial $4,778.00 payment, no funds shall be paid out of the National American Bank in N. O. account until such time as the Commission advises the Bank that the work is completed to the satisfaction of the Commission.

6. Owner agrees to deposit whatever additional funds are necessary to complete the work called for in Exhibit "C" if the Forty Seven Thousand Seven Hundred Eighty Dollars on deposit in the National American Bank in N. O. account is not sufficient to complete said work to the satisfaction of the Commission.

7. If the work called for in the contract by and between St. Louis Partners, Ltd. and Herman Construction, referred to herein as Exhibit "C" is not completed as of May 31, 1980 to the satisfaction of the Commission, the Commission shall be entitled to revoke and rescind the Servitude referred to herein or to enforce this Agreement by an action for specific performance.

8. This Agreement shall be binding on the parties hereto, their heirs, successors, assigns, transferees and purchasers.

9. Obligor shall at all times carry adequate property and liability insurance for the Property, including the exterior facade, front and roof, at his sole cost and expense. Any damage occurring to the Property, including the exterior facade, front or roof, shall be promptly repaired by Obligor at his sole cost and expense. Vieux Carre Commission shall not be liable to Obligor or any third person for any use, including the performance of and work thereon of the Property, including the exterior facade, front or roof. Obligor shall indemnify, hold harmless and provide a complete legal defense to Vieux Carre Commission for any liability which may arise from any use, including the performance of any work thereon on the Property, including the exterior facade, front or roof.

It is understood and agreed that the rights, interests, obligations and benefits herein constitute a real servitude in perpetuity and is and shall be binding on Grantor, his heirs, successors and assigns, and on all subsequent owners of the above described property and any buildings and improvements located thereon.

The two documents were executed simultaneously and, as previously stated, together constitute the servitude at issue. Both documents were recorded in the land records of New Orleans.

To pay the expenses incurred for the facade renovations, a second escrow account was established at National American Bank of New Orleans (National American) on December 28, 1979. Funding of the account was accomplished by way of a $48,000 withdrawal from National American account number 01–36314–2 and deposit of the same amount in National American account number 01–36353–3. The joint signatories on this second account were Landry and Henry M. Lambert, director of the VCC. With the exception of the $48,000 to establish the second bank account, no withdrawals were made in 1979 from either account at National American.

During 1980 and 1981, St. Louis Partners paid $239,596.52 to renovate and convert the interior of the building into nine condominium units, eight of which were subsequently sold or otherwise disposed of by the partnership. In addition, $47,780 was paid by St. Louis Partners to renovate and repair the

facade of the building during the same 2 years. Only minimal work on the facade was done in 1979.

To establish the proper fair market value for the donated servitude, petitioners and respondent each presented the testimony of an expert witness. Jared Shlaes testified for petitioners and Max J. Derbes, Jr., testified for respondent.

Petitioners' expert witness, Jared Shlaes (Shlaes), is a member of the Appraisal Institute and is a member of the Easement Valuation Panel of Appraisers for the National Trust for Historic Preservation and is qualified to give an opinion as to the value of real estate. Shlaes practices primarily in the Chicago metropolitan area. Prior to his testimony in this case, Shlaes had never appraised any real estate property in the French Quarter of New Orleans or anywhere in New Orleans. Petitioners did not submit a written expert report. Shlaes testified orally as to his opinion regarding the fair market value of the facade servitude. Shlaes determined the fair market value of the facade servitude on December 28, 1979, to be $94,000.

Respondent's expert witness, Max J. Derbes, Jr. (Derbes), is a member of the Appraisal Institute (MAI) and the American Institute of Real Estate Appraisers (AIREA) and is qualified to give an opinion as to the value of real estate. He has performed real estate appraisals in New Orleans since 1946 and is familiar with real estate in the French Quarter of New Orleans. Derbes performed an appraisal of the building and prepared a detailed written report of his opinion regarding the value of the facade servitude donated to the VCC. Derbes determined the fair market value of the facade servitude donated on December 28, 1979, to be $24,500, exclusive of rehabilitation work to be performed after 1979. Alternatively, Derbes determined the fair market value to be $53,500, inclusive of rehabilitation work to be performed after 1979.

## OPINION

Petitioners have an interest in St. Louis Partners, a limited partnership, by reason of being partners in a partnership which itself is a limited partner in St. Louis Partners. St. Louis Partners was formed for the purpose of acquiring, rehabilitating, holding for investment, and operating an apartment building located at 835 St. Louis Street, New Orleans, Louisi-

ana. The building, which was vacant and partially gutted at the time of its acquisition, is located in the French Quarter of New Orleans, a historic district under the control of the Vieux Carre Commission (VCC).

On November 30, 1979, St. Louis Partners purchased the building for $300,000. The purchase contract was conditioned upon the VCC agreeing to accept a donation of the building's facade pursuant to section 170(f)(3)(C)[3] and the partnership's agreeing to expend up to $185,000, exclusive of facade repairs, to rehabilitate the property. On December 28, 1979, St. Louis Partners donated the facade to the VCC by granting a servitude in perpetuity under Louisiana law. The servitude, for purposes of this case, is deemed to be the equivalent of a common law easement in perpetuity. The servitude agreement was created by two documents, each of which was itself an agreement between St. Louis Partners and the VCC, one entitled "SERVI-TUDE" and the other entitled "AGREEMENT."

The servitude agreement and the VCC's conditions for acceptance of the facade donation imposed substantial obligations and restrictions upon St. Louis Partners as owners of the property. The VCC staff recommendations, to which the partnership was required to accede, covered repairs and rehabilita-

---

[3]Sec. 170(f)(3) was amended by sec. 6(a), Pub. L. 96-541, 94 Stat. 3206, effective for transfers made after Dec. 17, 1980, in taxable years ending after that date. For certain years, including 1979, sec. 170(f)(3) provided:

(3) DENIAL OF DEDUCTION IN CASE OF CERTAIN CONTRIBUTIONS OF PARTIAL INTERESTS IN PROPERTY.—

(A) IN GENERAL.—In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest has been transferred in trust. For purposes of this subparagraph, a contribution by a taxpayer of the right to use property shall be treated as a contribution of less than the taxpayer's entire interest in such property.

(B) EXCEPTIONS.—Subparagraph (A) shall not apply to a contribution of—

(i) a remainder interest in a personal residence or farm,

(ii) an undivided portion of the taxpayer's entire interest in property,

(iii) a lease on, option to purchase, or easement with respect to real property granted in perpetuity to an organization described in subsection (b)(1)(A) exclusively for conservation purposes, or

(iv) a remainder interest in real property which is granted to an organization described in subsection (b)(1)(A) exclusively for conservation purposes.

(C) CONSERVATION PURPOSES DEFINED.—For purposes of subparagraph (B), the term "conservation purposes" means—

(i) the preservation of land areas for public outdoor recreation or education, or scenic enjoyment;

(ii) the preservation of historically important land areas or structures; or

(iii) the protection of natural environmental systems.

tion work on the outside of the entire main building as well as the slave quarters. In this connection, the partnership was required to place $47,780 in escrow to cover the cost of this work, all of which money was subsequently spent.

The servitude agreement also gave the VCC very substantial control over the entire exterior of both the main building and the slave quarters. Without question, there is a certain amount of overlap between the facade control ceded to the VCC by the servitude agreement and the control inherently vested in the VCC by the provisions of the Louisiana Constitution dealing with the historic preservation of the Vieux Carre and various statutes and municipal zoning ordinances enacted in furtherance thereof. Unquestionably, however, the partnership by the facade donation also voluntarily relinquished substantial flexibility in the use of the property and committed itself to the expenditure of substantial funds which it otherwise would not have been required to make.

It is also significant that in connection with the purchase of the property, the partnership was obligated to perform rehabilitation of the building, exclusive of facade repairs, for an amount not to exceed $185,000. Although the record is not clear on this point, the rehabilitation expenditure commitment was apparently required by the sellers to insure performance of certain obligations of their own. As a matter of fact, the partnership ultimately spent $239,596.52, rather than the $185,000 to which the partnership was committed under the purchase and sale agreement. The $239,596.52 was spent to renovate and convert the interior into nine condominium units and was over and above the approximately $47,800 spent to renovate and repair the facade.

The parties agree that the facade donation qualified as a real property easement in perpetuity for conservation purposes under section 170(f)(3)(B)(iii), as in effect for 1979 (see discussion *infra*), and as a charitable contribution to the VCC under section 170(c)(1). Neither party has raised a question as to whether there might not have been an incompleted gift in 1979 because of the conditions on its acceptance imposed by the VCC. Therefore, the only issue to be decided is the fair market value of the facade donation on December 28, 1979. In this connection, it is conceivable that both parties tacitly proceed on the assumption that the partnership was irrevoca-

bly committed to comply with the conditions for acceptance dictated by the VCC, so that the facade donation was, in fact, a completed gift in 1979. Petitioners' expert expressed the opinion that the fair market value of the gift was $94,000, although, on brief, petitioners assert a value of $108,400. Respondent contends that the fair market value was $24,500.

Section 1.170A–1(c)(1), Income Tax Regs., provides that if a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value, according to the regulations, is the price at which the property would exchange hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A–1(c)(2), Income Tax Regs.; see *Thayer v. Commissioner,* T.C. Memo. 1977–370 (value of open space or scenic easement determined).

For certain years (including 1979) ending before December 18, 1980, a charitable contribution deduction was allowed for a perpetual easement donated to a qualified charitable organization if the donation was "exclusively for conservation purposes." Sec. 170(f)(3)(B)(iii) (1979 version). The term "conservation purposes" was defined in section 170(f)(3)(C) to include:

(i) the preservation of land areas for public outdoor recreation or education, or scenic enjoyment;
(ii) the preservation of historically important land areas or structures; or
(iii) the protection of natural environmental systems.

No established market existed to which one might refer directly to determine the fair market value of the easement. As in *Thayer v. Commissioner, supra,* the parties agreed that the only feasible method of valuing the easement was by measuring the difference between the fair market value of the property immediately before the easement was granted and the fair market value of the property immediately after the easement was granted. Stated another way, the question becomes: what was the difference, if any, in the value of the property with and without the easement?

This approach was apparently approved by Congress in connection with the 1980 amendments to section 170(f)(3), referred to above (Pub. L. 96–541, sec. 6(a), 94 Stat. 3206),

although the Senate report issued in connection therewith states that "Where this test is used, however, the committee believes it should not be applied mechanically." S. Rept. 96–1007 (1980), 1980–2 C.B. 599, 606.

The before and after approach is also the one recommended in "Appraising Easements—Guidelines for Valuation of Historic Preservation and Land Conservation Easements" (October 1984), a document (of which we took judicial notice at the trial) prepared by the National Trust for Historic Preservation and the Land Trust Exchange. The Internal Revenue Service has also approved use of the before and after method. See Rev. Rul. 73–339, 1973–2 C.B. 68, and Rev. Rul. 76–376, 1976–2 C.B. 53.

Before discussing the expert testimony offered by petitioners and respondent, it is helpful to summarize certain general principles of easement valuation which have guided our decision in this case.[4] Initially, our objective is to determine whether, and to what degree, the easement changes the use and value of the property. As its name implies, the before and after method accomplishes this objective by subtracting the value of the property immediately after the imposition of the easement from the value of the property immediately before the imposition of the easement to estimate the value of the easement.

"Before" value (before value) is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement. At this stage, the suitability of the property's current use under existing zoning and market conditions and realistic alternative uses are examined. Any suggested use higher than current use requires both "closeness in time" and "reasonable probability." Next, to the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacement cost, and comparable sales) are used, but are modified to take into account any peculiarities of the property which impact on the relative weight to be afforded each respective method.

---

[4]See National Trust for Historic Preservation and the Land Trust Exchange, "Appraising Easements—Guidelines for Valuation of Historic Preservation and Land Conservation Easements" (October 1984).

"After" value (after value) is arrived at by first determining the highest and best use of the property as encumbered by the easement. At this stage the easement's terms and covenants are examined, individually and collectively, and compared to existing zoning regulations and other controls (such as local historic preservation ordinances) to estimate whether, and the extent to which, the easement will affect current and alternate future uses of the property. Next, the above-mentioned three approaches to valuing property are again utilized to estimate the value of the property as encumbered by the easement.

With these general principles in mind, we now examine the respective expert testimony offered by the parties.

*Jared Shlaes (Shlaes)*

Petitioners' expert, Shlaes, utilized the before and after method of valuation. With respect to the before value, Shlaes considered the size and shape of the property, its location in the French Quarter, its comparative value in relation to the adjacent corner property as well as several other comparables, its zoning, its apparent condition in 1979, and its highest and best use. In addition, Shlaes reviewed the purchase contract, inspected the property, investigated the area, and accounted for the $80,000 escrow created at the time of purchase for future rehabilitation.

Applying a market data approach and using several properties listed in an appraisal report compiled by Derbes, as well as the corner lot adjacent to the building, Shlaes determined the value of the land to be $98,000 or $30 per square foot of land area. He further determined in a test calculation the value of the improvements, prior to rehabilitation, to be $214,000. Shlaes concluded that his analysis supported the stated contract price of $300,000. To this he added the $80,000 escrowed for future rehabilitation because he determined the purchasers to be irrevocably obligated, bringing the total before value to $380,000.

With respect to after value, Shlaes concluded that the market data approach and the income approach could not be utilized. Furthermore, the cost approach offered only an "extremely tenuous indication" of value. Thus, he concluded that his subjective judgment was the only basis upon which to determine the after value.

In making this judgment, Shlaes focused on the differences between the easement granted and the existing zoning laws and ordinances as well as the authority of the VCC. His purpose was to determine what, if any, additional burdens were imposed on the property as a result of granting the easement. He concluded that the easement created "substantial additional burdens."

Shlaes determined the highest and best use of the property to be "rehabilitation with some possibility of eventual conversion to condominium or merger with the corner property to do some sort of combined development." Shlaes accorded great weight to his finding that the easement prevented assemblage with the corner lot and therefore restricted the highest and best use of the property.

Moreover, Shlaes found the easement to require major rehabilitation which imposed added problems for the owners. For instance, additional problems were associated with rehabilitation, getting permits for construction, and finding craftsmen who could do the quality work required by the VCC. The owners' ability to obtain construction financing and permanent financing for subsequent purchasers of the condominium units was also adversely affected by the easement, according to Shlaes. In addition to the added burdens already listed, Shlaes concluded that sales resistance and market resistance of any buyers would be increased due to the newness of historic preservation easement donation programs. He reasoned:

Nobody could know how the commission would enforce its right against the donor. Nobody could know how the court decisions would go about those rights, and nobody could measure the interference with the redevelopment of the property that might be asserted by the donee, so there was a substantial interference with the owner's position.

Other factors analyzed by Shlaes in ascertaining the after value of the property included the location, market timing, use, age, and condition of the building. After compiling and analyzing the information which he deemed relevant, Shlaes concluded that the additional burdens imposed by the easement resulted in a 12-percent diminution in value of the property. Converted into a dollar figure, the 12-percent dimi-

nution equaled approximately $46,000.[5]

Finally, Shlaes determined that the obligation to rehabilitate the facade as a condition of the VCC accepting the donation was beyond what normal rehabilitation would entail in the French Quarter. Therefore, Shlaes concluded that the $48,000[6] burden imposed by the easement in effect amounted to a further devaluation of the property after the easement. Thus, Shlaes determined the total value of the easement to be $94,000.

To summarize, the numerical computations performed by Shlaes were as follows:

$300,000 – stated contract price
+ 80,000 – amount escrowed for future rehabilitation
380,000
× 0.12 – percent of diminution
46,000 – diminution value rounded to nearest $1,000
+ 48,000 – amount escrowed for future facade repairs
94,000 – fair market value of easement

## Max Derbes (Derbes)

Respondent's expert, Derbes, utilized the before and after method of valuation. With respect to before value, Derbes considered the highest and best use of the property, its location, size, shape, condition, and existing restrictions.

Derbes defined the highest and best use of the property as "that use which at the time of appraisal is most likely to produce the greatest net return to the land and/or building over a given period of time." According to Derbes, this use must be logical, likely, reasonably probable, and proximate, and not such as is merely possible.

Derbes examined factors such as size, location, neighborhood character, trend of development, and the relevant zoning ordinance in arriving at his determination of highest and best use. He concluded that the highest and best use of the property was as residential rental units with the potential for conversion to condominiums.

Derbes then applied four separate approaches of valuation to estimate the before value of the property: the market data,

---

[5] The actual figure is $45,600 computed as follows: $380,000 × 0.12.
[6] The actual figure is $47,780.

modified cost, income, and utilization as a condominium project. The market data approach utilized involved an analysis of recent sales and offerings of similar properties in the general area (although none were found in the Vieux Carre itself). In addition, Derbes researched and compared sales of unimproved land in the Vieux Carre. This enabled Derbes to estimate not only the value of the subject site but also the land value of the improved comparable sales to indicate net unit value of the buildings. Derbes concluded after analysis of the sales data that the unimproved land value of the property was $23.06 per square foot, or $75,000.[7]

Derbes then analyzed comparable sales of improved properties, factoring in the land value as determined. His analysis considered the sale price, date of sale, number of units, gross building area, price per square foot, individual unit prices, extent of renovation, and quality of renovation. He estimated value through four separate computational methods: gross price/square foot method, price/unit method, breakdown method, and gross rent method. The resulting values ranged from a high of $325,000 to a low of $286,000. Derbes concluded that the breakdown method provided the most reliable indicator of value, computed as follows:

> Estimated contributory value of buildings
> 7,167 sq. ft. gross building area × $31.00/sq.ft. ... $222,177
> Estimated contributory value of carriageway,
> balconies, patio, site improvements ................... 20,000
> Plus: Estimated land value................................ 75,000
> Indicated value via breakdown method ............... 317,177

Derbes then utilized a modified cost approach of valuation which entailed utilization of the acquisition price of the building as well as expenditures made on the property. The classical cost approach (involving reproduction cost) was deemed inapplicable by Derbes because of the property's age, construction quality, and physical depreciation. The underlying assumption of the modified cost approach is that the property is worth the sum total of what the purchaser paid plus the cost of existing improvements. An additional increment may be added because of other costs and associated appreciation.

---

[7] The actual value is $74,991.12 computed as follows: 3,252 sq. ft. × $23.06.

Derbes computed the value of the property pursuant to the modified cost approach as follows:

Acquisition price .......................................... $300,000
Increment for closing costs, interest, etc .......... 20,000
Total indicated value .................................... 320,000

Derbes determined that it was unnecessary to make a subjective time adjustment to account for appreciation since the date of valuation (the donation date) was shortly after the acquisition date. Moreover, since no improvements were made prior to the date of donation, no upward adjustment was necessary.

Next, Derbes utilized a classical income approach which entailed research and analysis of rental and expense data to arrive at an estimated value of the property. The gross income and net operating income are established by comparing the subject property with other buildings of similar usage presently leased. In addition, expenses and rental income information were obtained from the prior owners.[8] Net operating income is determined by subtracting total expenses from gross income. Then net income is converted into a value figure by applying a capitalization rate to the income figure.

Based upon prevailing market rates in the area, and Derbes' understanding of the property's relative place in the market, Derbes determined the applicable capitalization rate to be 5.5 percent.[9] Derbes then computed the property's value based on an income method of valuation as follows:

Gross potential income ($2,200/mo. × 12 months) .......... $26,400
Less: Vacancy and credit allowance (5 percent) .............. 1,320
Effective gross income ............................................. 25,080
Less: Total expenses ................................................ 10,050
Net operating income ............................................... 15,030

Net operating income divided by capitalization rate = Value
($15,030 ÷ .055 = $273,273)

Derbes also examined the before value of the property with reference toward development of the property as a condominium project. This method entailed an analysis of comparable

---

[8]Approximately 1 year prior to the sale of the building, the former tenants moved and the building was vacant and then gutted. Landry estimated that gross monthly rent before the tenants moved was approximately $2,200 per month. Derbes used this figure in computing gross income.

[9]The written report at one point indicates a 7-percent capitalization rate but subsequently uses a 5.5-percent rate. Application of a 7-percent rate would result in a $214,715 value.

condominium projects in the area to arrive at a price per square foot that could be achieved if the property was sold as individual condominium units. Derbes determined the average price per square foot obtainable to be $125. Derbes' calculations assume that the total costs incurred subsequent to the date of donation, including those for the exterior facade, would have needed to have been spent in order to realize the unit price of $125 per square foot.

Derbes then calculated value as follows:

| | |
|---|---|
| Estimated retail market value of units | |
| 5,421 S.F. × $125.00/S.F. | $677,625.00 |
| *Costs* | |
| Legal, accounting, etc. ...$10,000 | |
| Financing cost and interim interests... 30,000 | |
| Marketing and advertising ...45,000 | |
| Total costs | 85,000.00 |
| Net to real estate promoter | 592,625.00 |
| Profit to promoter (including risk) | 80,000.00 |
| Indicated value of real estate with improvements | |
| made after 1979 being considered | 512,625.00 |
| Less: Facade, building and condominium renovation | 287,396.52 |
| Indicated value of property as of the date of donation | 225,228.48 |

With respect to three of the before value approaches utilized (modified cost, use as a condominium project, and market data), Derbes also estimated the value of the property with the improvements. However, Derbes' final determination as to market value is based on the premise that improvements made after the date of donation should not be factored into the calculation since market value is to be determined as of the time of donation.

Derbes concluded that the modified cost approach and the market data approach are the most reliable indicators of value. After correlating all the information involved in his analysis, Derbes concluded that the market value of the property before the date of donation was $320,000.

Derbes next estimated the value of the property after the donation. This step of his analysis entailed an examination of the servitude itself to determine what, if any, additional burdens are imposed on the property owners as a result of the servitude.

Derbes considered the current use of the property as well as the highest and best use of the property given the likelihood of

development absent the restrictions imposed by the easement. The VCC's facade easement policy and existing zoning restrictions were also accounted for by Derbes. Certain additional limitations were also considered, such as the VCC's right to require the owner to perform work on the property, order materials or workmanship more costly than the owner would otherwise elect, and require the work to be done at a time when the owner might not want to make capital expenditures.

In addition, Derbes evaluated the servitude's impact on value because of the VCC's insurance requirement, its right of ingress and egress, the requirement that the VCC's written approval and consent be given for any change, alteration, renovation, or improvement to the facade or roof, and the fact that the easement is granted in perpetuity. Derbes examined the relative positions of the VCC, the city, and the property owner, as well as buyer motivation, the nature of the local market, and the impact the servitude could have upon mortgage lending policies.

After considering all of the factors delineated above, Derbes concluded that the easement grant resulted in diminution in market value of 10 percent. Therefore, Derbes determined after value of the property to be $295,500, computed as follows:

| | | |
|---|---|---|
| Before value | = | $320,000 |
| Less land value | = | 75,000 |
| Improvement value | = | 245,000 |
| Diminution percent | = | 0.1 |
| Diminution value | = | 24,500 |
| Before value | = | 320,000 |
| Less diminution value | = | 24,500 |
| After value | = | 295,500 |

The $24,500 difference between before value and after value is Derbes' determination of the fair market value of the easement donated to the VCC on December 28, 1979.

Derbes then attempted to verify the 10-percent diminution in value figure with what little market data he could obtain. He conducted an empirical study of properties located in metropolitan New Orleans encumbered by easements. An in-depth examination of the sales history of each property so encumbered was conducted and then compared with the sales history of a number of similar properties which were not

encumbered by easements. The available data were limited to three cases in which a sale of property had occurred subsequent to the facade donation.

Derbes' analysis indicated that two of the properies sold did not suffer any measurable diminution in value because of the facade donation. However, the other property examined indicated a 9-percent diminution in value as a result of the easement.

A final analysis performed by Derbes involved an examination of eight condominium projects in the French Quarter, including the one here at issue. The purpose was to determine what, if any, impact the facade donation had on subsequent sales of the individual condominium units. Only two of the eight projects examined involved facade donations. Derbes concluded from the data examined that there was no discernable difference between the adjusted unit values for those units in complexes with donated facades' as opposed to units in complexes where the facades had not been donated. Derbes did, however, qualify this assessment by recognizing the potential for minor errors resulting from subjective judgments necessitated by the lack of similarity between projects. Derbes concluded that the empirical study conducted, although based on limited data and certain subjective judgments, tended to support his determination that the easement resulted in a 10-percent diminution in value.

At respondent's request, Derbes also valued the easement taking into account the value of renovations which occurred subsequent to the date of the facade donation. The post-donation expenditures of $287,396.52[10] are estimated to have added $287,400 to the value of the property. As noted earlier, the $24,500 valuation gives no credit for renovations made to the property in 1980 and 1981. Applying the prior analysis but giving credit for post-donation renovations, Derbes determined the value of the easement to be $53,500 computed as follows:

---

[10]This figure consists of $239,596.52 for interior renovation and $47,800 for facade renovation.

| | | |
|---|---|---|
| Before value | = | $610,000 |
| Less land value | = | 75,000 |
| Improvement value | = | 535,000 |
| Diminution percent | = | 0.1 |
| Diminution value | = | 53,500 |
| Before value | = | 610,000 |
| Less diminution value | = | 53,500 |
| After value | = | 556,500 |

The $53,500 difference between before value and after value is Derbes' alternative determination of the fair market value of the easement donated to the VCC, on December 28, 1979, based upon credit being given for post-donation expenditures and exclusion of land value.

We have carefully examined the expert testimony of both Shlaes and Derbes, the detailed written report of Derbes, and the entire record before us. In spite of the disparity between the experts' ultimate valuation conclusions, close scrutiny of their respective analysis indicates a substantial degree of agreement. Both experts utilized the before and after approach and both experts believed the market data approach to be a reliable indicator of before value. Moreover, Shlaes and Derbes both analyzed the elements of the servitude agreement to determine the impact, if any, it had on after value. In resolving the valuation question before us, we have drawn on each expert's testimony, eliminating certain conclusory elements we believe to be erroneous.

With respect to the servitude's impact on value, Shlaes determined that a 12-percent diminution in value resulted from the servitude grant. Specifically, Shlaes opined that substantial burdens were added to the property. Derbes, on the other hand, concluded from his analysis that the additional burdens resulting from the servitude were only minimal, but nevertheless was willing to concede that a 10-percent diminution is reasonable.

In general, we find Derbes' methodology more convincing than that of Shlaes, although we think the ultimate value to be placed on the facade donation must reflect certain of Shlaes' conclusions. For example, we agree with Shlaes that the easement created more substantial additional burdens than Derbes was willing to concede, for the reasons contained in the foregoing summary of Shlaes' testimony. However, we

think these additional burdens are, in fact, adequately reflected in the 10-percent diminution factor determined by Derbes. Shlaes conceded that his 12-percent figure was wholly subjective. Derbes, on the other hand, arrived at an objective 10-percent figure in the manner we have previously described. We therefore accept Derbes' 10-percent figure.

We also agree with Shlaes and part company with Derbes in Shlaes' belief that land value, being an integral part of improved real estate, cannot be factored out in determining before and after value.

As we previously observed, no question has been raised about the facade donation being a completed gift in 1979. Derbes stated that in arriving at his principal valuation figure of $24,500 he disregarded the rehabilitation and renovations performed subsequent to the property's acquisition by the partnership. We think this was erroneous. If the facade donation had become a completed gift only in the year in which the rehabilitation and facade renovation was finished, then Derbes would have taken these items into account. But since we are proceeding upon the assumption that the partnership was irretrievably out of pocket, because of its commitment under the purchase and sale agreement and the servitude agreement, to spend an amount not to exceed $185,000 for rehabilitation, and $47,780 for facade renovations, we think these amounts must be added to the value of the property, both for before value and after value purposes. In further support of this, we would add that at the time the property was acquired by the partnership the likelihood that its renovation costs would be any less than $185,000 was so remote as to be negligible. This was duly born out by the $239,596.52 actually spent in 1980 and 1981. These figures become significant, of course, in applying Derbes' 10-percent servitude diminution figure which, as already stated, we accept.

Thus, we conclude that it is appropriate to modify Derbes' alternative determination in the following manner:

```
Before value
  Cost of property (includes land)..... $320,000
  Rehabilitation commitment........... 185,000
  Facade renovation ....................... 47,780
Total ................................................. $552,780
Times: Diminution percent......................... 0.1
Diminution value..................................... 55,278

Before value .......................................... 552,780
Less: Diminution value.............................. 55,278
After value........................................... 497,502
```

On the foregoing basis we find the value of the facade donation to be $55,278.

On brief, petitioners assert a facade donation value of $108,400, rather than Shlaes' $94,000, to take into acount $20,000 of indirect acquisition costs allowed by Derbes but not taken into account by Shlaes. Petitioner computed the $108,400 figure as follows:

```
Acquisition cost
  Per contract ............................... $300,000
  Indirect costs............................. 20,000
  Rehabilitation commitment........... 185,000
  Total acquisition cost............................... $505,000
  Times: Percentage diminution..................... 0.12
  Unadjusted value of facade donation ........... 60,600
  Plus: Renovation expenses ......................... 47,800
  Value of facade donation ......................... 108,400
```

Thus, petitioners apply their 12-percent diminution to the cost of the rehabilitated property (land and building) to determine what we have denominated as "unadjusted facade donation," and to this figure have added the $47,800 facade renovation cost to which the partnership was committed. We believe, however, that if the land is an integral part of the property for valuation purposes, then likewise the renovated facade is also an integral part of the property. Thus, we conclude that the facade renovation cost of $47,780 must be included in the before value of the property to reflect the total before value of $552,780, against which Derbes' 10-percent

percentage diminution, rather than Shlaes' 12 percent, is to be applied.

To reflect the foregoing and prior concessions,

*Decision will be entered under Rule 155.*