**Robert E. RICHMOND and Barbara H. Richmond**

v.

**UNITED STATES of America.**

**Civ. A. No. 87–2938.**

United States District Court, E.D. Louisiana.

Oct. 17, 1988.

Paul H. Waldman, New Orleans, La., for plaintiffs.

David N. Crapo, Dept. of Justice, Washington, D.C., Eneid A. Francis, Asst. U.S. Atty., New Orleans, La., for defendant.

ROBERT F. COLLINS, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause having been duly tried, the Court, upon consideration of the pleadings, the evidence and arguments of counsel, hereby makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. On or about May 28, 1980, plaintiffs, Robert E. Richmond and Barbara H. Richmond, acquired an undivided 25% fee simple interest with respect to certain real property (hereafter "the real property") located at 613–615 Dumaine Street, New Orleans, Louisiana.

2. Their share of the total purchase price of $150,000.00 was $37,500.00.

3. On December 29, 1980, plaintiffs granted a real right, in perpetuity (hereafter "the facade donation"), to the City of New Orleans, to be administered by the Vieux Carre' Commission (VCC), in, over and to the exterior facade, front, sides and roof of the buildings and improvements (hereafter "the facade easement") located at 615 Dumaine Street.

4. The VCC is a governmental agency responsible for the historic preservation of the French Quarter, a six-block by thirteen-block area in New Orleans bordering the Mississippi River.

5. Before accepting the facade donation, the City of New Orleans, acting through the VCC, required a commitment that certain specific renovations be made to the real property.

6. With respect to the foregoing costs of renovation, the amount of $68,387.00 had been incurred prior to the facade donation. Plaintiffs' share thereof was $17,096.75.

7. The cost of *all* renovations, including the renovations described above, was $235,387.00. Plaintiffs' share thereof was $58,846.75.

8. On their 1980 and 1981 joint federal income tax returns, plaintiffs claimed deductions of $30,010.00 and $7,934.00, respectively.

9. These deductions were based on the allegation by the plaintiffs that the total value of the facade easement was worth $150,000.00, the purchase price of the real property and the value of plaintiffs' interest in the easement which was $37,500.00.

10. Pursuant to an audit, the Internal Revenue Service (IRS) partially disallowed the deduction for 1980 and fully disallowed the deduction for 1981, basing the corrected deduction for 1980 on a determination that the value of the plaintiffs' interest in the facade easement was $4,607.00.

11. On June 6, 1986, the United States, through an authorized delegate of the Secretary of the Treasury, made an assessment against plaintiffs for a deficiency due and owing for their 1980 federal income tax liabilities (including interest) in the amount of $20,657.84, and for their 1981 income tax liabilities (including interest), in the amount of $5,662.60.

12. The assessment described in paragraph 11 above, includes the sum of $8,607.00 in tax and $12,050.84 in interest for the year 1980. The assessment for 1981 includes $3,027.00 in tax and $2,635.66 in interest.

13. Interest was assessed against plaintiffs pursuant to 26 U.S.C. § 6621(d) (now

26 U.S.C. § 6621(c)(1)). That section imposes penalties for a substantial underpayment as a result of a "tax-motivated transaction."

14. Plaintiffs contend that the facade donation is worth between 20% and 25% of the value of the real property at 613–615 Dumaine Street, plus those restoration costs directly attributable to preparing the facade for donation.

15. James Derbes, a former owner of property subject to a facade donation, testified at trial that he sold his property at 1112 Burgundy Street for approximately 20% less than his asking price. Yet, he did not testify as to the value of the facade donation on the Burgundy Street property. Indeed he was not offered as an expert witness in the valuation of real property or facade donations. James Derbes did not testify as to the value of plaintiffs' property or the facade donation on that property. He merely testified that he listed his property for $350,000.00 after obtaining listings on several similar properties. Yet, the government's expert witness, Max Derbes, testified that, based on Empirical Studies, the Burgundy Street property sold for only 5% less than comparable properties. James Derbes also testified that he was under pressure to close the sale on the Burgundy Street property in order to finalize purchase of other property. Further, James Derbes did not attempt to testify as to what motivated the buyer, Mr. Frank Schwaiger, to offer 20% less than the listed price on the Burgundy Street property. Mr. Schwaiger did not testify for the plaintiffs, although he was listed in the pretrial order.

16. Edward Bopp, a major owner of property in the Vieux Carre', testified that he would not purchase property encumbered by a facade donation without discounting the value of the property by 25%. Bopp based his statement partially on what he perceived would be a difficulty with respect to either obtaining financing on such property or selling the property. At trial, this Court ruled that Mr. Bopp could not testify as to the value of the facade donation on the property at 613–615 Dumaine Street, because he had not been offered or qualified as an expert. Mr. Bopp's testimony regarding the general decline in the value of property encumbered by a facade donation does nothing towards establishing the value of the facade donation on the Dumaine Street property. Additionally, Mr. Bopp admitted that he had never attempted to obtain financing on property subject to a facade donation.

17. Dorian Bennett, a real estate broker and property owner, testified that he encountered difficulties in obtaining financing when he attempted to renegotiate a loan on property he owned that was encumbered by a facade donation. However, Mr. Bennett admitted that he contacted a limited number of lending institutions in New Orleans, and there was ample evidence in the government expert's Empirical Study that some lending institutions will make loans on facade donated properties. See defendant's Exhibit 5b. Indeed, it appears from Mr. Bennett's testimony that some of the difficulty arose from his unwillingness to pay the fees that would result from his transfer of the loan to another financial institution.

18. While there was testimony that three or four lending institutions in New Orleans will not make loans on properties with a facade donation, there was ample evidence that others would. Clarence Machado, a loan officer for the Bank of Louisiana in Covington, Louisiana, testified that although he was not sure if the Bank of Louisiana would finance property subject to a facade donation, he would recommend such a loan as long as the appraisal was good, and as long as the borrower had an established relationship with the bank and had a good credit record. Further, the Empirical Studies of the government's expert show that there have been other buyers of property subject to a facade donation who have obtained funds through local financial institutions.

For the reasons outlined in the following Conclusions of Law, this Court finds that plaintiffs have failed to show the value of the facade easement to be more than that determined by the Internal Revenue Ser-

vice pursuant to their audit of plaintiffs' tax returns. Further, based on the subsequent appraisal obtained by the United States for the purposes of this litigation, this Court finds the value of the facade easement to have been no more than $59,000.00, as of the date of the facade donation, and therefore plaintiffs' interest could have been worth no more than $14,750.00 as of the same date. Plaintiffs overvalued the facade donation by a factor well in excess of 150%, and accordingly, their valuation was a tax motivated transaction and the additional interest based thereon was properly assessed against plaintiffs.

19. To the extent that these Findings of Fact also constitute Conclusions of Law, they are specifically adopted as both Findings of Fact and Conclusions of Law.

### Conclusions of Law

1. Section 170(f)(3)(B)(iii) of the Internal Revenue Code (26 U.S.C.) allows a charitable deduction for a perpetual easement donated to a qualified organization exclusively for conservation purposes.

2. "Conservation purposes" includes the preservation of historically significant structures. 26 U.S.C. § 170(h)(4)(A)(iv).

3. In the instant case, it is clear that the facade easement is perpetual, the VCC is a "qualified organization" for purposes of § 170(f)(3)(B)(iii), and that the donation of the facade easement, having been made to preserve a historically significant structure, was made for "conservation purposes." The only major question remaining is a determination of the value of the facade easement.

4. The amount allowable as a deduction with respect to the donation of such a perpetual easement is the fair market value of said easement as of the date of the donation. Treas.Reg. § 1.170A–1(c). The United States contends that the facade easement was worth no more than $59,000.00 as of the date of the donation; plaintiffs contend it was worth $150,000.00 or the purchase price of the real property.

5. As pointed out in the legislative history of 26 U.S.C. § 170(f)(3) and by the United States Tax Court in *Hilborn v.*

*Commissioner of Internal Revenue,* 85 T.C. 677 (1985), there exists no well-established commercial market in facade or conservation easements. Consequently, the "willing buyer/willing seller" test may be difficult to apply. S.Rep. No. 96–107, 96th Cong. 2nd Sess. While Congress contemplates that this test should be used in the future, once there exists a sufficient sampling of sales of properties encumbered with such easements, *id.,* at 6571, plaintiffs' use of the "willing buyer/willing seller" test, at this point, is premature. Moreover, at trial, plaintiffs could not correctly apply this test because they did not estimate the value of the subject property based on comparable sales of properties encumbered by facade easements. They merely presented testimony concerning the sale price of other property encumbered with a facade donation without the appropriate comparison and evaluation.

6. Accordingly, conservation easements are typically, but not necessarily, valued indirectly as the difference between the fair market value of the property involved before and after the donation. *Id.* The "before/after" method is the one recommended by the National Trust Historic Trust Preservation and the Land Trust Exchange in "Appraising Easements"—Guidelines for Valuation of Historic Preservation and Land Conservation Easements, and is approved by the Internal Revenue Service. Rev.Rul. 73–339, 1973–2 CB 68; Rev.Rul. 76–376, 1976–2 CB 53; *see also, Hilborn v. Commissioner of Internal Revenue,* 85 T.C. 677 (1985). *William B. Akers v. Commissioner of Internal Revenue,* Par. 84,490 PH Memo T.C. [available on WESTLAW, FTX–TCT database] *aff'd.* 799 F.2d 243 (6th Cir.1984); *The Stanley Works & Subsidiaries v. Commissioner of Internal Revenue,* 87 T.C. 389 (1986); *Symington v. Commissioner of Internal Revenue,* 87 T.C. 892 (1986); *Fannon v. Commissioner of Internal Revenue,* Par. 86,572 PH Memo T.C. (1986) [available on WESTLAW, FTX–TCT database].

7. This method is explained in detail in *Hilborn.* The steps to be taken are as follows:

"Before" value ... is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement. At this stage, the suitability of the property's current use under existing zoning and market conditions and realistic alternative uses are examined. Any suggested use higher than current use requires both "closeness in time" and "reasonable probability." Next, to the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacecost and comparable sales) are used, but are modified to take into account any peculiarities of the property which impact on the relative weight to be afforded each respective method.

"After" value ... is arrived at by first determining the highest and best use of the property as encumbered by the easement. At this stage, the easement's terms and covenants are examined, individually and collectively, and compared to existing zoning regulations and other controls (such as local historic preservation ordinances) to estimate whether, and the extent to which, the easement will affect current and best use of the property. Next the above-mentioned three approaches to valuing property are again utilized to estimate the value of property as encumbered by the easement.

*Hilborn v. Commissioner*, 85 T.C. at 689.

8. The method set forth in *Hilborn, supra*, is in accord with the "before/after" method contemplated by Congress in the legislative history of § 170(f)(3). *See*, 1980 U.S.Code Cong. & Adm.News at 6750.

9. In applying the "before/after" test, the fact that property encumbered by a facade easement is otherwise encumbered by restrictions must be considered when determining any diminution in value caused by the assessment. 1980 U.S.Code Cong. & Adm.News at 6750.

It is by no means axiomatic that the value of property encumbered by a facade easement automatically declines as a result of the easement. A preservation easement may have minimal or no impact on property located in an historic district where preservation ordinances, already in effect, regulate the property. This is especially important in the instant case in that the real property is located in the Vieux Carre' of New Orleans. Property in the Vieux Carre' is regulated by the VCC. The VCC was created by Amendment to the Louisiana Constitution in 1936. Its purpose is stated in section 65-6, Chapter 65, City Code of New Orleans, as follows:

> The [VCC] shall have for its purpose the preservation of such buildings in the Vieux Carre' section of the City as, in the opinion of the Commission, shall have architectural and historical value and which should be preserved for the benefit of the people of the City and State.

The real property is zoned VCR-2 (non-conforming legal) and the relevant provisions of the New Orleans comprehensive zoning ordinance provided in relevant part on December 30, 1980:

> No occupancy permit shall be issued by the Director of Safety and Permits for any change in the use of any existing building located in any of the Vieux Carre' District until and unless a special permit shall have been issued by the Vieux Carre' Commission, except that where no change of exterior appearance is contemplated, such permit by the Vieux Carre' Commission shall not be required. Where any change in exterior appearance is contemplated, the Vieux Carre' Commission shall hold a hearing, and, if it approves such change, it shall issue a special permit to continue the same use, or for any other use not otherwise prohibited in this District, subject to the following conditions and safeguards:
>
> a. This historic character of the Vieux Carre' shall not be injuriously affected.
>
> b. Building designs shall be in harmony with the traditional architectural character of the Vieux Carre'.
>
> c. The value of the Vieux Carre' as a place of unique interest and character shall not be impaired.

Consequently, the facades of buildings in the Vieux Carre' are subject to extensive

regulation even absent a donation of the facade.

10. Moreover, not only may the donation of a facade have minimal or no detrimental effect on the affected real property it may, in fact, enhance the value of the property. The legislative history of § 170(f)(3) provides in relevant part that:

[The] easement may serve to *enhance,* rather than reduce the value of property, and in such instances no deduction would be allowable; for example, *where there is a premium in value of property of a historic nature.*

*Id.* (emphasis added). Hence, where, as in the instant case, there exists a facade donation concerning property of an historic nature, diminution in the value of property cannot be presumed. It is clear, therefore, from the legislative history cited above, that while Congress intended to encourage the donation of conservation easements for historic conservation purposes, it is equally clear that Congress did not intend to provide donors with a tax windfall.

11. In coming to their conclusion that the value of the facade easement as of the date of the donation was no more than $59,000.00, the Government's experts followed the procedure set forth in *Hilborn, supra.* They considered the location of the real property in the French Quarter and its availability for office/commercial use (in an area where properties permitted to be used in that manner are scarce) as enhancing the value of the real property. They then determined that, given the zoning regulations in effect and the unlikelihood of their change, demolition would not be approved. Accordingly, it was determined that the "best and highest" use of the real property was its current use.

12. In determining the "before" market value of the real property, the Government's experts, following *Hilborn,* added the base property value prior to renovation to the committed renovation costs. The committed renovation costs were deemed to be the plaintiffs' actual renovation costs. The direct/indirect renovation costs, $206,387.00, were found by the experts to be reasonable. The indirect renovation costs

were $29,000.00. The base property value was determined by comparing the purchase price of the real property with the purchase prices of similar properties selling in the same time frame as the donation. By this analysis, it was determined that $150,000.00 was the base property value. Thus, the total "before" value of the real property was found to be $385,000.00 as of December 30, 1980.

13. In determining the "after" value of the real property, the Government's experts conducted their investigation in accordance with *Hilborn* and the concerns raised in the legislative history of § 170(f)(3). They also considered an empirical study they had made of the sales of real property in the New Orleans area which were encumbered with facade easements. This study showed that such encumbrances caused minimal if any, diminution in the value of the encumbered property.

14. The Government's experts then considered the fact that the facade easement placed the following limitations on the real property:

1. The plaintiffs can be instructed to perform work on the real property when the Vieux Carre' Commission decides the same is necessary.

2. The Vieux Carre' Commission could order materials or workmanship more costly than the plaintiffs would elect.

3. The plaintiffs must provide adequate insurance on the facade.

4. The facade donation provides that New Orleans has a right of ingress/egress onto the real property.

5. The facade easement is perpetual.

6. The plaintiffs must obtain approval of any changes in the facade before making them.

As to restrictions Nos. 1 and 2, the Government's experts assumed that the City of New Orleans would be reasonable in these matters and, thus, they did not significantly diminish the value of the real property. As most property owners carry insurance on their property, restriction No. 3 was not considered burdensome. Restrictions Nos. 4 and 5 were not considered costly or trou-

blesome. In light of the requirement that proposed changes in the facade of a building in the Vieux Carre' be approved by the VCC even absent a facade donation, restriction No. 6 was found not to diminish the value of the property. Finally, the Government's experts did not find evidence that the existence of a facade easement on real property would preclude the owner (or buyer) from obtaining mortgage financing on the property.

15. Accordingly, applying *Hilborn* to the foregoing, it was determined that the facade easement diminished the basic property value of the real property by 10%. The basic property value includes:

| | |
|---|---|
| Property Acquisition Cost | $150,000.00 |
| Direct Renovation Costs not Specific to the Facade Easement | $184,201.00 |
| Indirect Renovation Costs Allocated to the Facade Easement | $ 25,883.00 |
| | $360,084.00 |

The basic value loss was, therefore, $36,008.00. In accordance with *Hilborn,* the sum of $25,303.00, which represented renovation costs allocable to the facade easement, was added to the basic value loss of $36,008.00. Subtracting the total of the basic value loss and the renovation costs allocable to the facade easement, the "after" value of the real property was determined to be $326,000.00.

16. Thus, the Government's experts found the value of the facade easement to be the "before" value of the real property ($385,000.00) less the "after" value ($326,000.00) or no more than $59,000.00.

■ 17. Plaintiffs' suit is in the nature of a taxpayer's refund suit, and plaintiffs bear the burden of proving both the excessiveness of the assessments and the correct amount of any refund to which they are entitled. *King v. United States,* 641 F.2d 253 (5th Cir.1981); *Carson v. United States,* 560 F.2d 693 (5th Cir.1977). This principle is set out by the United States Supreme Court in *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935). That court distinguishes between the plaintiffs' burden of proof before the tax court

and their burden of proof in district court for a refund of income taxes paid. *Helvering,* 293 U.S. at 514, 55 S.Ct. at 290. In order to recover money paid in a refund suit, plaintiffs have the burden of proving the Commissioner's assessment was wrong, and they must further establish the essential facts from which a correct determination of their tax liability can be made. *See Roybark v. United States,* 104 F.Supp. 759 (S.D.Calif.1952), *aff'd.,* 218 F.2d 164 (9th Cir.1954). The plaintiffs' heavy burden of proof in tax refund cases is justified by the strong need of the government to accomplish swift collection of revenues and encourage record keeping by taxpayers. *Carson,* 560 F.2d at 696 (*citing Bull v. United States,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); *Higginbotham v. United States,* 556 F.2d 1173 (4th Cir. 1977)).

■ 18. The Court recognizes the fact that based on their own expert's reports, the Government's original assessment was incorrect. Yet, plaintiffs have failed to establish a prima facie case and failed by a preponderance of the evidence to carry the burden of proving that the value of the facade easement on the Dumaine Street property was $150,000.00 as they contend. Plaintiffs did not attempt to bring forth any expert opinion to establish the value of the facade easement. Instead, they relied merely on the testimony previously outlined by the Court, which was a completely inadequate basis for this Court to determine the value of the facade easement. Since plaintiffs have failed to establish any facts from which a correct assessment of their liabilities can be made, the Court has concluded that the Government experts' subsequent evaluation is the correct one. The value of the facade donation was $59,000.00, and plaintiffs were entitled to deductions of no more than 25% of that amount, or $14,750.00.

19. In the case of interest payable under 26 U.S.C. § 6601 with respect to any substantial underpayment attributable to a tax motivated transaction, the annual rate of interest established under 26 U.S.C. § 6621 shall be 120% of the adjusted rate

established under 26 U.S.C. § 6621(b). 26 U.S.C. § 6621(c)(1) (formerly 26 U.S.C. § 6621(d)(1)).

20. A substantial underpayment attributable to tax-motivated transactions means any underpayment of taxes for any taxable year which is attributable to one or more tax-motivated transactions, if the amount of the underpayment for such year exceeds $1,000.00. 26 U.S.C. § 6621(c)(2) (formerly 26 U.S.C. § 6621(d)(2)).

21. A tax-motivated transaction includes any valuation overstatement within the meaning of 26 U.S.C. § 6659(c). 26 U.S.C. § 6621(c)(3) (formerly 26 U.S.C. § 6621(d)(3)).

22. Pursuant to 26 U.S.C. § 6659(c), valuation is overstated if the value of any property claimed on any return is 150% more of the amount determined to be the correct amount of such valuation.

23. In the instant case, with respect to their 1980 and 1981 returns, plaintiffs valued the facade easement at $150,000.00. Although there was evidence at trial that the value of the property may have been reduced to some extent due to the difficulties in obtaining financing, the plaintiffs had the burden of proving to what extent this affected the value of the property in order to show the correct amount of their tax liabilities. Plaintiffs failed to carry this burden of proof. Although the United States initially valued the easement at a lower amount, the Government's expert was the sole source of probative evidence at trial as to the value of the easement. Mr. Max Derbes, the Government's expert, determined by using the *Hilborn* "before/after" method that the facade easement is worth no more than $59,000.00. Clearly, plaintiffs over valued the facade donation by a factor well in excess of 150%. Since the plaintiffs' valuation was a tax-motivated transaction an additional assessment of interest against the plaintiffs is proper.

24. Based on the Findings of Fact and Conclusions of Law set forth above, plaintiffs' claims for a refund of taxes paid is hereby GRANTED IN PART AND DENIED IN PART. To the extent that the

Government's original assessment exceeded the appropriate assessment based on the report of the Government's expert, plaintiffs are entitled to a refund of taxes paid. To the extent that plaintiffs' claims for a refund are based on any valuation of the easement over $59,000.00, their claims must be DISMISSED.