RALPH D. CROWLEY and FRANCES A. CROWLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crowley v. Commissioner
Docket No. 10427-88
United States Tax Court
T.C. Memo 1990-636; 1990 Tax Ct. Memo LEXIS 706; 60 T.C.M. (CCH) 1447; T.C.M. (RIA) 90636; December 18, 1990, Filed *706 Decision will be entered for the respondent. James C. Donnelly, Jr., for the petitioners. Christine Colley, for the respondent. *707 JACOBS, Judge. JACOBS
*2082 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax for 1981 in the amount of $ 9,944 and for 1982 in the amount of $ 206,935. He also determined an addition to tax, pursuant to section 6651(a)(1), [1] for 1982 in the amount of $ 48,061. The section 6651(a)(1) addition to tax was determined because petitioners filed their joint income tax return for 1982 on February 14, 1988. Petitioners did not challenge the imposition of the section 6651(a)(1) addition to tax in their petition. They offered no testimony at trial to establish reasonable cause for their failure to file a timely return. Nor did they address this matter on brief. Accordingly, we conclude that petitioners have conceded the application of the section 6651(a)(1) addition to tax to the amount of tax due for 1982. Thus, the issues for decision are: (1) the fair market value of land donated by Ralph D. Crowley (singularly referred to as petitioner) [2] to the Commonwealth of Massachusetts in 1981, and (2) the proper tax characterization (loans vs. dividends) of petitioner's withdrawals from his family *708 controlled corporation, Polar Corporation (Polar), during 1982. *2083 FINDINGS OF FACT Petitioners resided seside in Worcester, Massachusetts, at the time they filed their petition. Donated Property
On December 9, 1981, petitioner donated a tract of undeveloped land, containing approximately 8 acres, located in Princeton, Massachusetts, to the Commonwealth of Massachusetts. On their 1981 tax return, petitioners reported that on the date of donation, the land had a value of $ 90,000. Subsequently, *709 they filed an amended 1981 return in which they claimed the land had a value of $ 150,000. At trial, petitioners contended that the fair market value of the land, at the time of donation, was $ 860,750. The donated property is adjacent to the Wachusett Mountain ski area with frontage on Mountain Road. At the time of donation, petitioner was the principal owner of a company that leased the land upon which the Wachusett Mountain ski area operated. The Wachusett Mountain ski area, which was being renovated by petitioner, primarily serves local skiers who commute to the area for the day. The donated property has direct access to the ski trails. Because of the property's incline, skiers can ski from the donated property to the ski slopes and return to the property by skiing down the mountain. The donated parcel is, and more importantly, was at the time of donation, located in a zoning district which restricts the property's use to single family detached dwellings. Because of zoning restrictions, the donated property can be subdivided into four home sites at most. In his notice of deficiency, respondent determined that at the time of donation, the donated land was capital gain *710 property having a value of $ 65,000. Advances From Polar
Polar is a Massachusetts corporation which manufactures soft drinks. It was formed by petitioner's grandfather in the early 1900's. During the years in issue, petitioner and his three brothers, Denis, Edward, and James Crowley, each owned 20.43 percent of Polar's stock; the Polar Corp. Employee Profit Sharing Plan owned the remaining 18.28 percent of stock. At all relevant times, petitioner was employed by Polar as its Chairman of the Board. Petitioner and his brothers customarily withdrew corporate funds for their personal use; such practice commenced sometime in the 1960's. The withdrawals were recorded on Polar's books as shareholder accounts receivable. Each of the Crowleys could "borrow" corporate funds without prior approval of the others. The "borrowings" were not in proportion to the Crowleys' stock ownership. The year-end balances of the shareholder accounts receivables for 1981, 1982, and 1983 were as follows: Year
Name
Amount
1981
Ralph D. Crowley
$ 18,540 James C. Crowley
* (49,342)
Denis M. Crowley
44,068 Edward D. Crowley
110,701 1982
Ralph D. Crowley
[3] $ 462,309 James C. Crowley
(9,537)
Denis M. Crowley
18,423 Edward D. Crowley
201,259 1983
Ralph D. Crowley
$ 590,083 James C. Crowley
29,560 Denis M. Crowley
6,273 Edward D. Crowley
276,381 *711 The shareholders' advance accounts were running accounts. Petitioner made some cash repayments and repayments through the crediting of year-end bonuses against his account. The shareholder advances were reported as current assets on Polar's financial statements. The shareholders signed confirmation statements addressed to Polar's auditors which acknowledged the net amount of payments made by Polar. None of the shareholders,however, executed promissory notes evidencing their indebtedness or pledged security for the advances. There was no specified repayment date for Polar's advances, and petitioner *712 did not sign any document committing himself to a specific repayment date. Petitioner had a stormy relationship with his brothers. In 1983, at a special meeting of Polar's board of directors, one of petitioner's brothers moved, without success, to revoke petitioner's check-writing privileges, alleging that petitioner's advances were excessive. Petitioner used the advances from Polar to invest in the renovation of the Wachusett Mountain ski project. Polar was prohibited from paying any dividends, or salaries in excess of $ 15,000 per year, pursuant to the terms of its Small Business Administration loan. Between 1978 and 1986, Polar paid no dividends to its stockholders. The record does not indicate whether Polar had current or accumulated earnings and profits in 1982. In his notice of deficiency, respondent determined that the withdrawals petitioner made *2084 from Polar during 1982 constituted dividend distributions. ULTIMATE FINDINGS OF FACT 1. On the date of donation, the fair market value of the land petitioner donated to the Commonwealth of Massachusetts was $ 64,000. 2. Petitioner's withdrawals from Polar during 1982 were dividends. OPINION Valuation *713 of Donated Property
Generally, when a taxpayer donates property, other than money, to a qualified charitable organization, the taxpayer may deduct the fair market value of the property on the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having a reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property is a factual question. Skripak v. Commissioner, 84 T.C. 285, 320 (1985). The fair market value of property reflects the highest and best use of the property on the valuation date. The Stanley Works and Subsidiaries v. Commissioner, 87 T.C. 389, 400 (1986). In determining highest and best use, we must examine the suitability of the property's current use under existing zoning and marketing conditions, together with any realistic alternative uses. Hilborn v. Commissioner, 85 T.C. 677, 689 (1985). The projected highest and *714 best use, however, must have a strong possibility of achievement. In other words, it cannot be remote, speculative or conjectural. Olson v. United States, 292 U.S. 246, 257 (1934). A potential highest and best use for property can be considered even though zoning laws prohibit the potential use on the date of the contribution. Nonetheless, the fair market value of the property must be adjusted for any restriction on its marketability. Cooley v. Commissioner, 33 T.C. 223, 225 (1959), affd. per curiam 283 F.2d 945 (2d Cir. 1960). In such a case, the value of the property at its highest and best use must be discounted by a reasonable estimate of the costs of removing the restriction and for the time needed to accomplish such removal. As is customary in valuation cases, here petitioners and respondent rely heavily on expert opinion to support their respective positions regarding the value of the donated property. We evaluate such opinions in light of the demonstrated qualifications of the experts and all other evidence of value. Parker v. Commissioner, 86 T.C. 547, 561 (1986). However, we are not bound by the opinion *715 of any expert witness when that opinion is contrary to our judgment. Parker v. Commissioner, supra.
Petitioners contend that the fair market value of the undeveloped land at the time of donation was $ 860,750, while respondent contends that the fair market value of the donated parcel was $ 65,000. [4] *716 The disparity between the parties' positions results primarily from their differing opinions of the highest and best use of the land. Petitioners argue that the highest and best use of the undeveloped land was as a hotel-contel, [5] whereas respondent asserts that the highest and best use of the property was as a site for four single-family homes. Petitioners' expert is the president of a firm which has engaged in the planning and construction of, and management consulting for, mountain resorts for thirty years. He is affiliated with several professional appraisal organizations. *2085 Petitioners' expert used the comparable sales method of valuation whereby information is gathered on sales of property similar to the subject property and adjustments are made for any differences between the comparable properties and the property being appraised. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n. 24 (1987). He concluded that in 1988, the value of the undeveloped land was $ 600,000, and had a developer built a 200-room hotel-contel on the property, the value of the land would have been $ 3,125,000. He then discounted these values to produce respective values for 1981. Finally, he averaged the two discounted *717 values to reach his conclusion that the fair market value of the land at its highest and best use was $ 860,750 in 1981. The methodology employed by petitioners' expert is faulty in several respects. First, the fair market value of property must reflect the highest and best use of the property. Values for two different uses are not averaged. It would be as illogical to do so as to ask three persons the right time, and average the three replies. Second, because of the uncertainties surrounding the renovation of Wachusett Mountain on the date the land was donated and the ski area's service of primarily local skiers, the potential availability of the donated property as a site for a 200-room hotel-contel is too speculative to be considered in determining the property's value. Third, assuming arguendo that valuation of the contributed land as a site for a hotel-contel is proper, petitioners' expert failed to discount the fair market value of the land by the estimated costs of obtaining a special zoning permit to allow construction of a hotel-contel and for the time needed to obtain such permit. Fourth, although petitioners' expert allegedly used the comparable sales method, his *718 report failed to analyze whether each comparable property was more or less desirable than the donated property, and merely accorded each property equal weight by averaging the sales price for all of the comparable properties. Regarding the value of the land when used for single family homes, petitioners' expert merely stated that "retail values for comparable, high end exclusive residential sites in the Princeton area currently run in the area of $ 150,000 per lot" without including any analyses of comparable properties. Finally, petitioners' expert offered no support for the discount rates used to compute the value of the property in 1981. Due to the numerous and serious flaws in the methodology used by petitioners' expert, we reject his conclusion. Respondent's expert witness has been a full-time real estate appraiser for over forty years and has extensive professional qualifications in the appraisal area. Respondent's expert concluded that the highest and best use of the land was as a site for four single-family residences. Like petitioners' expert, respondent's expert used the comparable sales method of valuation. The comparable sales method is a commonly accepted method *719 of appraising residential real estate. Estate of Spruill v. Commissioner, supra.Respondent's expert examined real estate sales transactions which occurred in the immediate neighborhood of the donated property and in competitive nearby communities. After examining the sales prices and characteristics of ten comparable properties and making adjustments based on whether the comparable properties were superior or inferior to the donated property, respondent's expert concluded that the value of the donated property was $ 64,000. We found the testimony offered by respondent's expert to be persuasive. We accept his opinion and find that at the time of donation, the fair market value of the land donated by petitioner was $ 64,000. Advances From Polar Corporation
The other issue for decision is whether the withdrawals petitioner made from Polar during 1982 were bona fide loans, as petitioners contend, or distributions taxable under sections 301 and 316, as respondent contends. Sections 301 and 316 provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of the corporation's earnings and profits. *720 Whether a shareholder's withdrawals from a corporation are loans or distributions depends on whether at the time of the withdrawals, the shareholder intended to repay the amounts received and the corporation intended to require payment. Miele v. Commissioner, 56 T.C. 556, 567 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973). Petitioner testified that he made the withdrawals from the corporation in good faith and intended to repay them. Even so, a mere declaration by a shareholder that he intended a withdrawal to constitute a loan is insufficient if the transaction fails to meet more reliable indicia of debt. Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980); Alterman Foods, Inc. v. Commissioner, 505 F.2d 873, 876 (5th Cir. 1974). We examine all the facts and circumstances surrounding the withdrawals. Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958). In deciding this issue, we must keep in mind that respondent's determination that the withdrawals were dividends is presumptively correct, and petitioners have the burden of proving that respondent's determination *721 is erroneous. *2086 Courts have considered various factors when deciding whether withdrawals are constructive dividends or loans; however, none of the factors, standing alone, is determinative. The factors include the following: (1) the extent to which the shareholder controlled the corporation; (2) whether the corporation had a history of paying dividends; (3) the existence of earnings and profits; (4) the magnitude of the advances and whether a ceiling existed to limit the amount the corporation advanced; (5) how the parties recorded the advances on their books and records; (6) whether the parties executed notes; (7) whether security was provided for the advances; (8) whether there was a fixed schedule of repayment; (9) whether interest was paid or accrued; (10) whether the shareholder made any repayments; (11) whether the shareholder was in a position to repay the advances; and (12) whether the advances to the shareholder were made in proportion to his stock holdings.
Alterman Foods, Inc. v. Commissioner, supra at 877 n.7; Pierce v. Commissioner, 61 T.C. 424, 430 (1974). Transactions between *722 a closely held corporation and its shareholders require scrutiny. Electric & Neon, Inc., v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion and affd. without published opinion sub nom. Jiminez v. Commissioner, 496 F.2d 876 (5th Cir. 1974). Even though petitioner did not own a majority of the Polar stock, he considered Polar's funds available to him for his own personal use. Petitioner, alone, made the decisions as to the timing, amount, and use of the funds he withdrew, and such situation invites special scrutiny. Electric & Neon, Inc. v. Commissioner, supra.
Petitioners place a great deal of emphasis upon Polar's accounting of the withdrawals as loans on its books as evidence of an intent to repay the advances. This factor is not determinative without further evidence substantiating the existence of a bona fide loan. Baird v. Commissioner, 25 T.C. 387, 394 (1955). Although we recognize that transactions of closely held corporations are frequently characterized by informality, the informality relating to the payments in question goes beyond what we would expect with respect to *723 purported loans of this size. The advances were not evidenced by notes. There was no set maturity date or event of default which would require petitioner to remit the funds at a certain time. There was no ceiling limiting the amount of the corporate advances. Moreover, petitioner did not pledge security for the advances. Usually, a shareholder's repayments are strong evidence that a withdrawal was a loan. The repayments, though, must be bona fide. Because petitioner withdrew funds from Polar with impunity, and thus could extract from Polar larger sums than he required and use the excess to make "repayments", petitioners have failed to persuade us that the repayments were bona fide. With respect to the year-end bonuses which were credited against his account, petitioner in essence withdrew sums, charged them to his loan account, and then reduced the "loan" by crediting the account with his bonus. Under these facts, the cash repayments and credits are not convincing evidence that the withdrawals were bona fide debts of petitioner. These partial repayments merely gave the distributions the color of loans. The payment of interest has a bearing on the issue of petitioner's intent *724 to repay. Polar, however, did not begin to charge interest on petitioner's advances until after the Internal Revenue Service began its audit of Polar on January 26, 1982. Hence, the value of such evidence is weakened. Petitioner claims that he intended to repay Polar with the cash-flow from the ski project. But the ski project did not produce any cash-flow; to the contrary, the ski project required the infusion of cash, which was the very reason petitioner needed funds from Polar. Further, there is no evidence that petitioner had committed himself, by way of mortgage or otherwise, to apply his share of the income from the ski project towards repayment of the Polar "debt." Petitioner further claims that he could have surrendered his Polar stock to the corporation in satisfaction of his "debt." We view such claim with skepticism. When a shareholder has nothing but the stock of the lending corporation from which to repay his alleged debt, such fact generally militates against him. As previously stated, petitioner was required to withdraw funds from Polar to finance the renovation of the Wachusett Mountain ski project, and it was his ownership of the Polar stock which enabled *725 him to withdraw corporate funds. Hence, it is unrealistic to assume that petitioner would repay the advances by surrendering his Polar stock. Petitioners note that the advances were not in proportion to the stock ownership of the corporation. It is well settled that a disbursement of *2087 corporate earnings to a shareholder may constitute a dividend to such shareholder notwithstanding that it is not in proportion to stock holdings or that some shareholders do not participate in its benefits. Roschuni v. Commissioner, supra at 1204. The record discloses, however, that at least one shareholder complained of the magnitude of petitioner's advances, and thus we find the disproportionate amount of the advances to be some evidence that the withdrawals were intended to be loans. Finally, we consider it relevant that pursuant to the terms of its Small Business Administration loan, Polar was prohibited from paying salaries in excess of $ 15,000 per year or any dividends. Because of these restrictions, Polar's shareholders were required to "borrow" funds from Polar in lieu of receiving dividends or increased salaries. Thus, Polar was forced to couch the distributions *726 to petitioner as loans. Petitioners have failed to carry their burden of proving that petitioner intended to repay the amounts withdrawn during 1982 at the time such amounts were withdrawn. The facts belie any intention to create a real debtor-creditor relationship. Accordingly, we find the net amount petitioner withdrew during 1982 is, in reality, a dividend distribution which is taxable to the extent of Polar's earnings and profits. Because the record fails to indicate the amount of Polar's accumulated and current earnings and profits in 1982, we assume Polar had earnings and profits in excess of the net amount of the withdrawals; thus, the entire amount of the withdrawals constitutes a taxable dividend. Decision will be entered for the respondent. [6]
*727 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All dollar amounts have been rounded to the nearest dollar.↩
2. Frances A. Crowley is a party to this proceeding solely by virtue of having filed joint returns with her husband, Ralph D. Crowley, for 1981 and 1982.↩
*. Numbers indicated in parentheses reflect a credit balance.↩
3. This amount differs from that stated in respondent's notice of deficiency; respondent based his deficiency notice adjustment on the net amount withdrawn, which was $ 443,769.↩
4. The amount of a charitable contribution deduction for a donation of capital gain property is, in general, calculated on the basis of the fair market value (as of the date of donation) of the property donated, subject to a limit of 30 percent of the donor's contribution base (the donor's adjusted gross income for the year of donation computed without regard to any net operating carryback). If the value of the donated property exceeds the 30-percent limit, the excess may be carried forward, as a charitable contribution, to the 5 succeeding taxable years in order of time. Alternatively, at the election of the taxpayer, the charitable contribution deduction can be calculated on the basis of the fair market value (as of the date of donation) of the property donated, reduced by 40 percent of the amount which would have been long-term capital gain if the property had been sold at its fair market value, subject to a limit of 50 percent of the donor's contribution base. See section 170(c). Petitioners did not make such an election. Thus, respondent (in his notice of deficiency) calculated the amount of petitioners' 1981 charitable contribution deduction, with respect to the land donated to the Commonwealth of Massachusetts, to be $ 35,099, which represented 30 percent of petitioners' contribution base for 1981. In making such calculation, respondent determined the land to have a value of $ 65,000 on the date of donation. Respondent then increased the amount claimed by petitioners as a charitable contribution deduction for 1982 by $ 29,901 ($ 65,000 - $ 35,099). Petitioners do not dispute the classification of the donated land as capital gain property. Because of the aforementioned 30-percent contribution base limit, the maximum 1981 charitable contribution deduction, with respect to the land donated by petitioners to to the Commonwealth of Massachusetts, is $ 35,099. Accordingly, the disagreement between the parties as to the value of the donated land only impacts years subsequent to 1981.↩
5. The parties used the term "contel" to describe a hotel in which the rooms are converted and sold to investors as condominiums. A professional management company rents the units to short-term clientele.↩
6. Although we find the value of the donated property to be $ 64,000, or $ 1,000 less than the amount determined by respondent in his notice of deficiency, because respondent failed to amend his pleadings to conform to the proof, petitioners are entitled to the $ 29,091 (rather than $ 28,091) charitable contribution deduction for 1982, as allowed by respondent.↩