142 T.C. No. 16

UNITED STATES TAX COURT

LOGAN M. CHANDLER AND NANETTE AMBROSE-CHANDLER,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16534-08.　　　　　　　　　　Filed May 14, 2014.

Ps granted to a qualified organization facade easements on two historic homes they owned. They claimed charitable contribution deductions for 2004, 2005, and 2006 based on fair market value appraisals of the easements. A portion of each of the 2005 and 2006 deductions resulted from a carryforward of a deduction they first claimed for 2004. R disallowed the deductions because he determined the easements were valueless. R imposed gross valuation misstatement penalties on the underpayments resulting from the alleged easement overvaluations.

Ps sold one of the homes in 2005 and reported capital gain. In calculating the gain Ps reported a basis in the home that exceeded their purchase price. They claim the basis increase resulted from costs they incurred to improve the home. They failed to substantiate the full amount of the improvement costs. R disallowed the entire basis increase and imposed an accuracy-related penalty on the resulting underpayment.

Ps contend they had reasonable cause for any underpayments and thus should not be liable for penalties. R claims that recent amendments to the gross valuation misstatement penalty preclude Ps from raising a reasonable cause defense for their 2006 underpayment. Ps argue that part of that underpayment resulted from a deduction carried forward from a return they filed before the amended rules took effect. They argue that applying the amended reasonable cause rules to their 2006 return would give the penalty amendments retroactive effect.

Held: Ps failed to prove their easements had any value and consequently were not entitled to claim related charitable contribution deductions.

Held, further, Ps adequately substantiated a portion of the basis increase they claimed on the home they sold and were entitled to reduce their capital gain by the substantiated amount.

Held, further, Ps are liable for an accuracy-related penalty for the portion of their 2005 underpayment resulting from unsubstantiated basis increases they claimed on the home they sold.

Held, further, Ps are not liable for gross valuation misstatement penalties for their 2004 and 2005 underpayments, because they underpaid with reasonable cause and in good faith.

Held, further, Ps are liable for a gross valuation misstatement penalty for their 2006 underpayment because the rules in effect when they filed their 2006 return did not provide a reasonable cause exception. Denying Ps' reasonable cause defense does not amount to retroactive application of the gross valuation misstatement penalty amendments.

Denis J. Conlon, Steven S. Brown, and Mason N. Floyd, for petitioner.

Carina J. Campobasso, for respondent.

GOEKE, Judge:  Petitioners owned two single-family residences in Boston's South End Historic District.  They granted a facade easement on each property to the National Architectural Trust (NAT) and claimed related charitable contribution deductions for taxable years 2004, 2005, and 2006.  In 2005 petitioners sold one of the properties and reported a capital gain.  Petitioners claimed a basis in the property that reflected $245,150 of improvements.

Respondent disallowed petitioners' charitable contribution deductions because he determined the easements had no value.  He also found that petitioners had understated their gain on the property sale because they had overstated their basis in the property.  Finally, respondent determined that petitioners were liable for accuracy-related penalties under section 6662.[1]

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

-4-

After concessions,[2] the issues remaining for decision are:

(1) whether the charitable contribution deductions petitioners claimed for granting conservation easements to NAT exceeded the fair market values of the easements. We hold they did;

(2) whether petitioners overstated their basis in the property they sold in 2005. We hold they did, but they were entitled to increase their basis for improvement costs they properly substantiated; and

(3) whether petitioners are liable for accuracy-related penalties under section 6662. We hold they are but in amounts less those respondent determined.

FINDINGS OF FACT

Some facts were stipulated and are so found. Petitioners resided in Massachusetts when they filed their petition.

A. Background

Petitioners filed joint Forms 1040, U.S. Individual Income Tax Return, for each of the years in issue. Mr. Chandler has a law degree and a master's in

---

[2]Petitioners have conceded their liability for a $1,064.85 addition to tax under sec. 6651(a)(1) for delinquently filing their 2004 return. Respondent has conceded that petitioners' donation of the easements complies with the requirements for deduction under sec. 170. Respondent disputes only petitioners' valuation of the easements.

business administration and works as a business consultant. Mrs. Ambrose-Chandler owns and operates an interior design company.

In 2003 petitioners purchased a home at 24 Claremont Park in Boston, Massachusetts (Claremont property). In 2005 petitioners purchased another home in Boston at 143 West Newton Street (West Newton property). Both homes are in Boston's South End, which the Federal Government has included in the National Register of Historic Places and designated a National Historic Landmark District.

B. Conservation Easements

Congress has created the Federal Historic Preservation Tax Incentives Program to encourage the preservation of historic structures. Under the program, owners of historic buildings may be entitled to charitable contribution deductions when they grant conservation easements on their buildings to organizations that will protect the buildings' historic character. The National Park Service (NPS) publicizes the program and assists the IRS in administering it. Mr. Chandler read about the program in a newspaper, and petitioners decided to grant a facade easement to NAT on the Claremont property. When they purchased the West Newton property, they again decided to grant a facade easement to NAT.

Under the terms of each easement, the property owner must obtain NAT's approval before beginning any construction that will alter the exterior of the

building. NAT periodically sends representatives to inspect properties on which NAT holds easements. If the inspector determines that a property owner has made unauthorized changes, NAT can order remediation.

Boston's municipal government has formed nine local historic district commissions to regulate construction within their jurisdictions. The South End Landmark District Commission (SELDC) has jurisdiction over the properties at issue here. The SELDC's powers closely approximate NAT's powers under the easement agreements with some exceptions.

First, the SELDC has no power to regulate construction that is not visible from a public way and may not require property owners to make repairs. The easement agreements grant NAT authority to regulate construction and order repairs on any exterior surface of the home. Second, NAT has staff members who perform annual site visits, while the SELDC relies on the public to alert it to potential violations. Finally, NAT has absolute authority to enforce the terms of its easements, even when doing so would produce substantial economic hardship for the property owner. Under Massachusetts law, a property owner who faces significant financial hardship may receive an exemption from the SELDC's enforcement. See Mass. Gen. Laws ch. 772, sec. 8 (1975).

Petitioners claimed charitable contribution deductions related to the easements on their 2004, 2005, and 2006 tax returns. Petitioners followed guidance from the NPS and consulted their easement holding organization to find an appraiser to value their easements. NAT recommended George Riethof and George Papulis, who valued the Claremont easement at $191,400 and the West Newton easement at $371,250. Petitioners consulted with their accountant concerning the appraisals before claiming deductions on their returns. Because of relevant limitations, petitioners deducted the values of the easements over several years. For the years in issue (2004, 2005, and 2006) petitioners claimed deductions for the easements of $73,059, $83,939, and $296,251 respectively.

Respondent determined the easements had no value because they did not meaningfully restrict petitioners' properties more than local law. Petitioners have abandoned their original appraisals, but they have presented new expert testimony supporting the values they claimed on their returns.

C. Gain on Home Sale

Petitioners purchased the Claremont property for $755,000 in 2003 when it was in poor condition. They renovated the property and in 2005 sold it for $1,540,000. On their 2005 return, petitioners reported an adjusted basis in the property that included $245,150 of improvement costs. During his examination,

respondent requested documentation substantiating the basis increase, but petitioners had misplaced their receipts. Later, petitioners produced receipts for expenses totaling $147,824.

Respondent's examiner initially concluded that petitioners had substantiated $60,000 of renovation costs. However, upon closer review, respondent noticed that petitioners had claimed larger than average cost of goods sold deductions for Mrs. Ambrose-Chandler's interior design business for the years during the renovations. Respondent believed that petitioners had deducted the renovation expenses on their Schedules C, Profit or Loss From Business, for 2004 and 2005, and accordingly respondent disallowed the entire $245,150 basis increase. Respondent did not seek substantiation for petitioners' Schedule C deductions during the audit.

OPINION

I. Conservation Easements

A. Background

Congress has provided tax benefits to taxpayers who grant conservation easements over historic properties they own. A conservation easement allows a third party, typically a charitable organization, to monitor the owner's use of

property. An organization holding an easement may prevent the owner from changing the property in a way that would destroy its historic character.

Under section 170, if taxpayers meet certain criteria, they may claim charitable contribution deductions for the fair market value of conservation easements they donate to certain organizations. See sec. 170(f)(3)(B)(iii); sec. 1.170A-1(c)(1), Income Tax Regs. Respondent concedes that petitioners have satisfied the technical requirements for the deductions, but he disputes their valuations of the easements. Petitioners bear the burden of proving their deductions reflected the easements' fair market values. See Rule 142(a)(1).

Easements are usually transferred by gift; consequently, we rarely have an established market on which to rely in determining their value. Simmons v. Commissioner, T.C. Memo. 2009-208, aff'd, 646 F.3d 6 (D.C. Cir. 2011); see also Hilborn v. Commissioner, 85 T.C. 677, 688 (1985). We have often used the "before and after" approach to value restrictive easements for which taxpayers have claimed deductions. See, e.g., Hilborn v. Commissioner, 85 T.C. at 688-689; Simmons v. Commissioner, T.C. Memo. 2009-208; Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990). Under this approach the fair market value of the restriction is equal to the difference (if any) between the fair market value of the property without the restriction (before value) and its fair

market value with the restriction (after value). Sec. 1.170A-14(h)(3)(I), Income Tax Regs. When a conservation easement enhances or does not materially affect the property's value, the taxpayer may not claim a deduction. Sec. 1.170A-14(h)(3)(ii), Income Tax Regs.

An appraiser may use the comparable sales method or another accepted method to estimate the before and after values of the property. Hilborn v. Commissioner, 85 T.C. at 689-690. An appraiser using the comparable sales method identifies property sales that meet three criteria: (1) the properties themselves are similar to the subject property; (2) the sales are arm's-length transactions; and (3) the sales have occurred within a reasonable time of the valuation date. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979). The appraiser uses the sale prices of the comparable properties to estimate the value of the subject property.

Both parties submitted expert reports concerning the values of petitioners' easements. Petitioners' expert was Michael Ehrmann, and respondent's expert was John C. Bowman III.

B.  The Ehrmann Report

Using the comparable sales approach Mr. Ehrmann calculated before values for the Claremont property and the West Newton property of $1,385,000 and $2,950,000 respectively.

To estimate the properties' after values, he attempted to quantify the effect of petitioners' easements.  Mr. Ehrmann analyzed sales of seven properties encumbered with easements similar to petitioners'.  He compared those sales with sales of comparable unencumbered properties to determine whether the easements diminished property values.  Of the seven encumbered properties he chose, four were in Boston and three were in New York City.  Accounting for Mr. Ehrmann's adjustments, the encumbered properties in the sample sold for an average of 18.5% less than the unencumbered properties.[3]

Mr. Ehrmann also included in his report information concerning a settlement agreement arising from the sale of encumbered property in New Orleans.  The property's seller did not disclose an existing conservation easement

---

[3]Mr. Ehrmann's report contains procedural errors.  He calculated the easement values by dividing the difference in sale prices by the encumbered property's price.  He then applied that percentage to the before value of petitioners' properties to calculate the easement values.  He should have divided the difference in sale prices by the unencumbered property's sale price.  We have adjusted the data in his report to account for this error.

to the buyer. After the buyer bought the property, he discovered the easement and sued the seller. The parties settled the dispute for 14.6% of the sale price. Mr. Ehrmann claims that the settlement represents direct market valuation of the easement restriction on the property.

On the basis of his data, Mr. Ehrmann estimated that petitioners' easements diminished their property values by 16%. Accordingly, he valued the easements at about 16% of their before values--$220,000 for the Claremont easement and $470,000 for the West Newton easement.

C. Ehrmann Report Analysis

Although Mr. Ehrmann used an appropriate methodology to isolate the easements' effects on property values, certain factors undermine its persuasiveness. The locations of the sample properties are our first concern. Mr. Ehrmann chose seven encumbered properties to measure against comparable unencumbered properties. Of those seven properties, only four are in Boston; the other three are in New York City. He also provided information concerning a property settlement in New Orleans. We find Mr. Ehrmann's analysis of the properties outside Boston unpersuasive. The values of easements in other markets tell us little about easement values in Boston's unique market.

Our second concern is the size of Mr. Ehrmann's sample. We recognize that the lack of encumbered property sales in petitioners' neighborhood limited the depth of Mr. Ehrmann's analysis. Nevertheless, we must adjust our confidence in his estimates accordingly. Although Mr. Ehrmann reviewed four encumbered property sales in Boston, only one, "Easement Encumbered Sale #1", is not obviously flawed. "Easement Encumbered Sales #s 2 and 4" are flawed because the "comparable" unencumbered property sales Mr. Ehrmann chose were not actually comparable. "Easement Encumbered Sale #3" is flawed because one of the comparable "unencumbered" properties was not actually unencumbered.

### 1. Easement Encumbered Sale # 1

"Easement Encumbered Sale #1" refers to the sale of the encumbered Claremont property. Mr. Ehrmann compared this sale to the sale of unencumbered property at 30 Claremont Park. Mr. Ehrmann determined the properties were in the same condition and adjusted the comparable property's sale price by only 1.3% for other minor differences. The encumbered property sold for 12.5% less than the unencumbered property.

### 2. Easement Encumbered Sales #s 2 and 4

"Easement Encumbered Sale #2" refers to the sale of the encumbered West Newton property. Mr. Ehrmann compared this sale to sales of unencumbered

properties at 118 West Newton Street and 176 West Canton Street. "Easement Encumbered Sale #4" refers to the sale of encumbered property at 306 Marlborough Street. Mr. Ehrmann compared this sale to sales of unencumbered properties at 285 Marlborough Street and 381 Beacon Street. Mr. Ehrmann significantly adjusted the sale prices of the "comparables" before he compared them to the encumbered property's sale price. The adjustments ranged from 11.2% to 20.3% and included significant adjustments based on Mr. Ehrmann's subjective evaluation of the properties' "condition".[4] Because of these significant subjective adjustments, Mr. Ehrmann's conclusions flowing from these comparisons largely reflect his opinion rather than the objective market values of the easements. When an appraiser makes numerous adjustments to a subject property's comparables, the subject property's valuation becomes less reliable. See Gorra v. Commissioner T.C. Memo. 2013-254, at *59. Accordingly, we give these two comparisons little weight.

3. Easement Encumbered Sale #3

"Easement Encumbered Sale #3" refers to the sale of encumbered property at 3 Cazenove Street. Mr. Ehrmann compared this sale to sales of comparable

---

[4]The "condition" adjustments were: 5% for 118 West Newton, 15% for 176 West Canton, 20% for 285 Marlborough, and 10% for 381 Beacon.

"unencumbered" properties at 6 St. Charles Street and 139 Appleton Street. After adjustments, Mr. Ehrmann concluded that the Cazenove Street property sold for 12.8% and 18.5% less than the St. Charles Street and Appleton Street properties respectively. He attributed these differences to the encumbrance on the Cazenove Street property. However, the St. Charles Street property's deed contains restrictions that are substantially the same as those the Cazenove Street property's easement imposes. This indicates that the difference in price resulted from some other factor that Mr. Ehrmann did not consider. This error undermines Mr. Ehrmann's credibility concerning not only this comparison, but the entire report.

### D. The Bowman Report

Mr. Bowman did not independently evaluate the properties' before values, but he reviewed the appraisals petitioners relied on for their return. Those appraisals included comparable sales analyses for each property. Mr. Bowman determined that the appraisals were reasonable aside from one minor error that resulted in a 10% undervaluation of the Claremont property. Mr. Bowman corrected that error and assigned before values to the Claremont and West Newton properties of $1,450,000 and $2,750,000 respectively.

To analyze the impact of petitioners' easements, Mr. Bowman selected nine recently encumbered Boston properties that sold between 2005 and 2011. He

compared their prices in the sales immediately preceding and succeeding the imposition of their easements. Each property had sold for more after it had been encumbered. Mr. Bowman annualized the appreciation rates between the sales and compared them to city wide appreciation rates for upper-tier properties. He found that the properties in his sample appreciated at a higher-than-average rate. On the basis of his analysis, he concluded that easements like petitioners' do not diminish the values of the properties they restrict and thus have no value. Mr. Bowman acknowledged that many of the homes in his sample had been significantly renovated, but he did not try to remove the renovations' effect on appreciation from his analysis.

E. Bowman Report Analysis

Mr. Bowman's sales analysis is not persuasive, because it does not isolate the effect of easements on the properties in his sample. The properties in his sample appreciated in spite of their restrictions. However, many of the properties had been significantly renovated, and Mr. Bowman's report does not account for the renovations' effects on the property values. The report demonstrates that, combined, the renovations and easements positively affected value, but the report does not isolate the effect of the easements. To measure one variable's effect, one

must hold all other variables constant. Mr. Bowman's report does not measure easements' effect on value, because he has not held other variables constant.

F. Conclusion

We do not find Mr. Ehrmann's report credible and therefore reject his conclusion that petitioners' easements diminished their property values by 16%. However, Mr. Ehrmann's failure to persuasively value the easements does not necessarily mean they had no value. Petitioners cite several cases in which we have upheld valuations similar to theirs. See, e.g., Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304 (2012); Dorsey v. Commissioner, T.C. Memo. 1990-242; Griffin v. Commissioner, T.C. Memo. 1989-130; Losch v. Commissioner, T.C. Memo. 1988-230. However, each of those cases involved commercial property. Restrictions on construction impair the value of commercial property more tangibly than they impair the value of residential property. Commercial property derives its value from its ability to generate cashflows. For commercial property, development generally correlates with increased future cashflows. More retail space, more space for tenants, and more room for customers generally increase profitability. Restrictions on the development of commercial property reduce potential for increased future cashflows and thus diminish value.

Construction restrictions affect residential property values more subtly. People do not buy homes primarily to make money, and personal rather than business reasons usually motivate any construction on their homes. The loss of freedom to make changes to the exterior of one's home has a price, but it is difficult to quantify. The task becomes even more difficult when we consider the already existing restrictions on the property. Even if petitioners had not granted the easements, local law would have prevented them from freely altering their homes. The easements had value only to the extent their unique restrictions diminished petitioners' property values.

Petitioners have identified several differences between the easement provisions and local law. The differences concern the scope, monitoring, and enforcement of the construction restrictions.

The easements have a broader scope than local law because they restrict construction on the entire exterior of the home and require property owners to make repairs. Local law restricts construction only on portions of the property visible from a public way, and local law does not require property owners to make repairs.

Petitioners also were subject to different monitoring procedures under the easement agreements. NAT inspects each of its properties annually for

compliance with applicable standards. The SELDC relies on the public to report violations. NAT's historical compliance standards are also slightly different from the SELDC's.

Finally, NAT has greater power to enforce the terms of its easements than the SELDC has to enforce local law. Unlike the SELDC, NAT has a right to enter property to inspect for compliance, and NAT can require corrective action. NAT can also enforce its easement terms even when doing so would impose substantial economic hardship on the property owner. Under State law an owner may obtain an exemption from local standards if compliance would cause a substantial economic burden.

We must determine the value diminution resulting from these additional restrictions. We recently performed this analysis under identical circumstances. In Kaufman v. Commissioner, T.C. Memo. 2014-52, we reviewed a NAT easement on a property in the South End Historic District. There we determined that the differences outlined above do not affect property values, because buyers do not perceive any difference between the competing sets of restrictions. Id. at *57. We see no reason to break with that result here. Mr. Ehrmann's report, which petitioners exclusively rely on to demonstrate their easements' values, was not credible. Respondent has persuasively argued that a typical buyer would

perceive no difference between the two sets of applicable restrictions here. We recognize technical differences between the easements and local law, but we agree with respondent's conclusion that the restrictions were practically the same. Because petitioners have not proved that the easements they donated had value, we sustain respondent's disallowance of the charitable contribution deductions they claimed.

II. Gain on Home Sale

Taxpayers must recognize gain when they sell property for more than its adjusted basis. Sec. 1001(a); sec. 1.61-6(a), Income Tax Regs. Taxpayers may increase their adjusted basis in property for costs they incur to improve the property, but they generally bear the burden of proving basis increases they claim. See sec. 1016(a); Rule 142(a); sec. 1.1016-2(a), Income Tax Regs. The burden may shift to the Commissioner if the taxpayer introduces credible evidence supporting a basis increase. See sec. 7491(a)(1). If taxpayers cannot produce records of actual expenditures, we may estimate the amounts of expenses if they provide credible evidence that provides a factual basis for the estimate. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

Petitioners increased their basis in the Claremont property by $245,150 for improvement costs they claim they incurred. Petitioners concede that they bear

the burden of proving they were entitled to the basis increase. They have presented documentary evidence that proves they incurred costs of at least $147,824 in improving the property. They have also submitted before and after photos of the home that demonstrate they made significant renovations.

Respondent acknowledges that petitioners made improvements to the home. However, he contends petitioners had likely already received tax benefits for the improvement expenses. In particular respondent notes that for the years during the renovations (2004 and 2005), petitioners reported unusually high costs of goods sold on their Schedules C for Mrs. Ambrose-Chandler's interior design business. Respondent believes that petitioners included their renovation expenses in the business' costs of goods sold, which would have prevented them from also increasing their basis in the property. See Thrifty Oil Co. v. Commissioner, 139 T.C. 198, 205, 217 (2012) (holding that taxpayer was not entitled to a double deduction for the same economic loss).

Petitioners have presented credible documentary evidence supporting $147,824 of their basis increase. Respondent contends that petitioners may have included the improvement costs in their Schedule C costs of goods sold for 2004 and 2005. This argument, first made at trial, raises a new matter for which respondent bears the burden of proof. See Rule 142(a)(1). Respondent cites the

abnormally high costs of goods sold petitioners reported for those years, but he has presented no evidence concerning the expenses underlying the total. Without more specific evidence, we cannot conclude that petitioners included the renovation expenses in their costs of goods sold. Respondent had ample opportunity to investigate petitioners' costs of goods sold during the examination, but he chose not to. He has failed to persuade us that petitioners included renovation expenses on their 2004 and 2005 Schedules C. Accordingly, we hold that petitioners were entitled to increase their basis in the Claremont property by $147,824.

Petitioners urge us to allow the full $245,150 basis increase they claimed despite their inability to produce documentary evidence for the full amount. They claim that pictures of the home before and after the renovations demonstrate that they made improvements beyond those for which they could produce receipts. The pictures indicate that petitioners made significant renovations, but we cannot say for sure that they cost more than $147,824. Accordingly, we decline to estimate further basis increases. Petitioners have failed to prove their entitlement to basis increases beyond those for which they produced documentary evidence. Petitioners' claim that they had receipts but lost them does not affect our result, because they have not shown that the loss was beyond their control. We hold that

petitioners were not entitled to basis increases beyond the $147,824 they substantiated.

## III. Accuracy-Related Penalties

Under section 6662, taxpayers may be liable for penalties for underpaying their income tax. A 20% penalty applies when the underpayment resulted from certain causes including negligence, a substantial understatement of income tax, or a substantial valuation misstatement. Sec. 6662(a) and (b)(1), (2), and (3). A 40% penalty applies when the underpayment resulted from a gross valuation misstatement. Sec. 6662(h). Although an underpayment may trigger the penalty for more than one reason, the Commissioner may not impose more than one penalty on a single portion of the underpayment. Sec. 1.6662-2(c), Income Tax Regs.

The Commissioner bears the burden of production with respect to penalties. Sec. 7491(c). To meet this burden, he must produce evidence regarding the appropriateness of imposing the penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001); Raeber v. Commissioner, T.C. Memo. 2011-39. Once the Commissioner carries his burden, the taxpayer bears the burden of proving the penalties are inappropriate because of reasonable cause or otherwise. Higbee v. Commissioner, 116 T.C. at 446.

A.  Underpayments Resulting From Easement Misvaluations

The Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 1219(a)(2)(B), 120 Stat. at 1083, amended the rules for the 40% gross valuation misstatement penalty.  Before the PPA the penalty applied when taxpayers misstated the value of their property by 400% or more, and taxpayers could avoid the penalty under certain circumstances if they made the misstatement in good faith and with reasonable cause.  The PPA lowered the threshold to 200% and eliminated the reasonable cause exception for gross valuation misstatements of charitable contribution property.  See secs. 6662(h), 6664(c).  The new rules apply to all returns filed after July 25, 2006.[5]  PPA sec. 1219(e)(3), 120 Stat. at 1086. The years in issue here straddle the PPA's effective date--petitioners filed their 2004 and 2005 returns before July 25, 2006, but they filed their 2006 return after.

Petitioners misvalued their easements.  They claimed deductions of $191,400 and $371,250, but they have failed to prove the easements had any value.  Under either version of section 6662(h) the valuation misstatements are "gross" and trigger the 40% penalty.  However, the facts raise a novel issue concerning petitioners' right to raise a reasonable cause defense for their 2006

---

[5]For charitable contributions of property other than facade easements, the effective date is August 17, 2006.

underpayment. Petitioners note that a portion of the underpayment resulted from the carryover of charitable contribution deductions they first claimed on their 2004 return, which they filed before the PPA's effective date. Accordingly, they argue, denying their right to raise a reasonable cause defense would amount to retroactively applying the PPA.

Petitioners acknowledge that, by its plain language, the statute applies for their 2006 return, but they urge us to look beyond the plain language because of its retroactive effect. We disagree with petitioners that applying the amended reasonable cause rules for their 2006 return amounts to retroactively applying the PPA. Accordingly, we need not look beyond the statute's plain language, and we apply the amended reasonable cause rules to petitioners' 2006 underpayment.

When taxpayers file a return that includes carryforward information, they essentially reaffirm that information. The amended reasonable cause rules were in effect when petitioners filed their 2006 return, which reaffirmed the Claremont easement's grossly misstated value. Applying those rules does not amount to retroactive application. The plain language of the statute makes the rules applicable for all returns filed after July 25, 2006. Petitioners filed their 2006 return after that date and consequently may not raise a reasonable cause defense

for their 2006 underpayment, which resulted exclusively from gross valuation misstatements.

We evaluate petitioners' reasonable cause defense for their 2004 and 2005 underpayments under the pre-PPA rules. Even before Congress enacted the PPA, more rigorous reasonable cause rules applied to taxpayers who substantially or grossly misvalued charitable contribution property. Under pre-PPA rules such taxpayers could raise a reasonable cause defense only if: (1) the property value they claimed on their return was based on a qualified appraiser's qualified appraisal and (2) they made a good-faith investigation of the property's value. Sec. 6664(c). Respondent concedes the appraisal requirement but argues that petitioners have not met the good-faith investigation requirement. We disagree.

Respondent's chief criticism of petitioners' efforts appears to be their failure to independently assess the easements' values. Respondent contends that because Mr. Chandler had a law degree and worked as a business consultant, he should have known his appraiser had overvalued the easements. Petitioners are well educated, but they have no experience valuing easements. Even experienced appraisers find valuing conservation easements difficult because they are not bought and sold in established markets. Average taxpayers would not know where to start to value a conservation easement, and even well-educated taxpayers like

petitioners must rely heavily on the opinions of professionals. Petitioners retained an appraiser to value their easements. To choose the appraiser, petitioners relied on the National Park Service's advice and consulted their easement holding organization, NAT. We have identified flaws in the initial appraisals, but they would not have been evident to petitioners. Although petitioners could not rely exclusively on the appraisals, they were entitled to give them substantial weight. Petitioners corroborated the appraisals with advice from an experienced accountant. We think these actions represent a good-faith attempt to determine the easements' values. Accordingly, petitioners may raise a reasonable cause defense for their 2004 and 2005 underpayments resulting from gross valuation misstatements.

In Kaufman v. Commissioner, at *72-*75, we held that taxpayers whose investigation approximated petitioners' had not established reasonable cause for their gross misvaluation of a conservation easement. However, the taxpayers' investigation of value in Kaufman took place under different circumstances. In Kaufman, after the taxpayers had received their initial appraisal they became worried that the easement would devalue their home too much. They expressed their concern to a representative of NAT, and he assured them that the easement would have no effect on the resale value of their home. The taxpayers' continued

reliance on the initial appraisal in the face of the representative's comments led in part to our conclusion that the taxpayers' investigation of value was in bad faith. Here there is no evidence that petitioners relied on the appraisals in bad faith, and we hold that their investigation was sufficient to allow them to raise a reasonable cause defense.

Taxpayers can establish reasonable cause by demonstrating they reasonably and in good faith relied on the advice of a tax professional or appraiser. Sec. 1.6664-4(b), Income Tax Regs. To determine whether a taxpayer's reliance on professional advice was reasonable and in good faith we consider all facts and circumstances, including "the taxpayer's education, sophistication and business experience". Sec. 1.6664-4(c), Income Tax Regs.

Petitioners have established reasonable cause for misvaluing their easements. Mr. Chandler has a law degree and significant business experience, but he has no valuation experience. Even without valuation experience most taxpayers can evaluate the reasonableness of an appraisal for most forms of real property. But easements are different because most taxpayers have never bought or sold an easement. Petitioners followed the NPS's suggestion for choosing an appraiser and relied on his report. The report was not so deficient on its face that petitioners should have reasonably discounted it. They obtained their accountant's

assurances before they claimed the easement deductions. On these facts we believe petitioners have established reasonable cause, and we hold they are not liable for accuracy-related penalties on the portions of their 2004 and 2005 underpayments that resulted from misvaluing their easements.

B.  Underpayments Resulting From Unsubstantiated Basis Increases

Respondent imposed a 20% accuracy-related penalty on the portion of petitioners' 2005 underpayment resulting from unsubstantiated basis increases in the Claremont property. Respondent argues that the penalty applies because that portion of the underpayment resulted both from a "substantial understatement" of income tax and from petitioners' negligence. We hold that petitioners are liable for the 20% accuracy-related penalty because this portion of the underpayment resulted from their negligence.

"Negligence * * * includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. Petitioners have not retained records supporting the full amount of the basis increase they claimed for the Claremont property. They have failed to properly substantiate $97,326 of the basis increase they reported. The reasonable cause exception applies to penalties for negligence, but petitioners have not established reasonable cause. They claim they kept records but that some were

lost when they moved from the Claremont property to the West Newton property. They have not proved that the loss resulted from circumstances beyond their control, and they have failed to offer a reasonable reconstruction of the lost records.  Cf. Mears v. Commissioner, T.C. Memo. 2013-52.  Section 6001 requires taxpayers to keep records long enough to properly substantiate items they claim on their returns.  Petitioners have failed to do so and are accordingly liable for the 20% penalty on the portion of their 2005 underpayment resulting from the unsubstantiated basis increase.

To reflect the foregoing,

Decision will be entered under

Rule 155.