# United States Tax Court

T.C. Memo. 2026-20

JEFFREY PESARIK,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 23859-22.                                  Filed February 23, 2026.

————

*Timothy J. Burke*, for petitioner.

*Patrick F. Gallagher*, *Christopher J. Richmond*, and *Erika B. Cormier*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Chief Judge*: During 2020 petitioner, Jeffrey Pesarik, sold a property that he owned in Wakefield, New Hampshire (Wakefield Property), for $187,000, and another that he owned in Hull, Massachusetts (Hull Property), for $556,800. Mr. Pesarik did not report the gain from either sale on his 2020 federal income tax return. The Commissioner thereafter issued a notice of deficiency, which determined a deficiency in Mr. Pesarik's 2020 income tax and an accuracy-related penalty.

In this Court Mr. Pesarik asserts that certain renovation expenditures and closing costs increased his basis in the Wakefield Property and limited his taxable gain to $55,799. He further contends that he was entitled to exclude the entirety of his gain from the Hull

[*2] Property sale under section 121[1] because it had been his principal residence for more than two years.  The Commissioner does not think that Mr. Pesarik has proved either point.

We conclude that Mr. Pesarik has provided sufficient substantiation of his Wakefield Property expenses to allow an estimate under the rule announced in *Cohan v. Commissioner*, 39 F.2d 540, 542–44 (2d Cir. 1930).  Mr. Pesarik fails to demonstrate that the sale of the Hull Property qualifies for the section 121 exclusion.

FINDINGS OF FACT

We tried this case in Boston, Massachusetts, and find the following facts based on the pleadings, stipulations of facts, and trial evidence.  Mr. Pesarik lived in Portsmouth, New Hampshire, when he filed his petition.

I.  *Background*

Mr. Pesarik grew up in New Hampshire.  After earning a bachelor's degree in business management and finance, he worked as a property manager in Seattle, Washington; Dallas, Texas; and Washington, D.C.

Mr. Pesarik maintained ties to the Granite State, buying a property in Epping, New Hampshire, in the mid-2010s.  He moved back to New Hampshire in fall 2016 to arrange the affairs of his late mother.

Mr. Pesarik used his expertise in property management to renovate and sell his late mother's house.  By Mr. Pesarik's estimate, his work increased the house's value from $400,000 to $587,000, the price he remembered the property fetching when it was sold in 2017.[2]

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts have been rounded to the nearest dollar.

[2] Although Mr. Pesarik did not specify a sale year during his trial testimony, we take judicial notice of online Portsmouth property records, which reflect that the Theresa N. Pesarik Revocable Trust sold a house in Portsmouth for $585,000 on March 27, 2017.  *See* Fed. R. Evid. 201(b); Vision Government Solutions, Property Lookup, Portsmouth, NH, https://gis.vgsi.com/PortsmouthNH/Search.aspx (search in search bar for "214 Elwyn Ave.") (last visited Feb. 11, 2026).

[*3] Mr. Pesarik and his two siblings each received $157,000 from this sale, with Mr. Pesarik also obtaining reimbursement for his expenses.

II.    *Property Purchases*

   A.    *Wakefield Property*

Mr. Pesarik's pursuits upon his return to New Hampshire were not confined to the rehabilitation of his late mother's house. On November 17, 2016, Mr. Pesarik purchased the Wakefield Property (2110 Province Lake Road East, Wakefield) for $30,000.

The Wakefield Property was approximately 45 minutes north of Portsmouth by car. According to Mr. Pesarik, the Wakefield Property was "[b]asically . . . a chicken coop" and a "torn up" and "hammered" house in an "extremely rural" community when he purchased it. Unlike the relatively modest fine-tuning on his mother's house, Mr. Pesarik testified that he "pretty much built a new house" at the Wakefield Property, which included "underground utilities, water, septic, [and] foundation work."

   B.    *Hull Property*

On July 6, 2018, Mr. Pesarik purchased the Hull Property (59 B Street, Hull) for $394,750. The Hull Property, which sits two blocks from the beach, was a two-hour drive from Portsmouth, on the far side of Boston. Mr. Pesarik did not file Massachusetts state income tax returns during the time he owned the Hull Property, nor did he obtain a Massachusetts driver's license.

   C.    *Property Sales*

Mr. Pesarik sold both properties during 2020. He first sold the Wakefield Property for $187,000 on March 30, 2020,[3] incurring $17,843 in closing costs. On October 7, 2020, he sold the Hull Property for $556,800, incurring $24,967 in closing costs. Shortly before the Hull Property sale closed, Mr. Pesarik provided an Arizona driver's license to verify his identity as the owner of the Hull Property.

---

[3] The parties stipulated that Mr. Pesarik disposed of the Wakefield Property on or around March 30, 2020, and the deed conveying the property was also executed on this date. The settlement statement, however, includes a settlement date of March 31, 2020. Consistent with our Rules, we will treat the stipulated date as the date the property was sold. *See* Rule 91(e).

[*4] III.    *2016–20 Financial Activity*

During the relevant years, Mr. Pesarik relied on credit cards and a business bank account at Bank of America under the name of Internet Realty, a real estate brokerage and property management sole proprietorship that he owned.  Specifically, in 2016 Mr. Pesarik used his Bank of America bank account, an American Express credit card, a Costco Citi card, and (starting in November 2016) a Home Depot credit card.  The Home Depot card played a particularly prominent role, with Mr. Pesarik spending approximately $46,000 from November 2016 through September 2020.  Mr. Pesarik also used a Lowe's Synchrony Bank credit card, with statements showing that he spent approximately $8,000 on this card from July 2018 to November 2020.

The American Express statements in the record reflected an address for Mr. Pesarik in Manassas, Virginia, in the first half of 2016.  In fall 2016 Mr. Pesarik's mailing address changed, with his late mother's address in Portsmouth serving as the mailing address for American Express card (and later the Home Depot card) statements, and a Portsmouth post office box serving as his mailing address for the Costco Citi card and Bank of America statements.  By February 2017 all of Mr. Pesarik's statements were addressed to the Portsmouth post office box, which continued until February 2020 when the mailing addresses changed to either the Hull Property or a post office box in Hull.

The 2016–20 statements show activity throughout New Hampshire and Massachusetts, with increasing frequency in Massachusetts during 2019 and 2020.  The statements reflect numerous transactions at Home Depot, Lowe's, and Tractor Supply Co.  The store locations vary.  The statements reveal that Mr. Pesarik sometimes engaged in transactions at or near Epping, Portsmouth, Wakefield, or Hull (or in the general vicinity of several of these locations).  At other times they demonstrate that he made purchases (or returns) at stores at some distance from any of these towns.

The Bank of America statements include copies of checks drafted in 2016 and 2017.  These checks were made out to electricians, plumbers, painters, and lumber yards, among other individuals and entities.  Some of the checks bore the notation "2110" on the memo line, while others had no legible writing.

[*5]  The credit card statements describe Mr. Pesarik's purchases to varying degrees of specificity.  For example, the Home Depot statements provide general categories of purchases, such as "seasonal/garden," "seasonal/garden electrical and lighting," "flooring," "millwork lumber," and "paint hardware lumber."  The Lowe's statements are more precise, breaking down purchases such as "gate hardware," "circular saw blades," and "spray foam insulation."

## IV.  *2020 Tax Reporting and Examination*

On his 2020 income tax return Mr. Pesarik listed his Portsmouth post office box as his home address, which was also the address on a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., attached to the return.  Mr. Pesarik reported taxable income of $16,478 and claimed a refund of $60.  He did not report income from the sale of either the Wakefield Property or the Hull Property on this return.

Based on third-party reporting, the Internal Revenue Service issued a computer-generated notice of deficiency, which calculated automatically via electronic means a deficiency of $271,774 and an accuracy-related penalty of $54,355.

## OPINION

## I.  *Legal Standards*

### A.  *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving error in the determinations.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Mr. Pesarik does not contend, and the evidence does not establish, that the burden of proof should shift to the Commissioner under section 7491(a).  Accordingly, Mr. Pesarik bears the burden of proof for the issues in dispute.

### B.  *Recordkeeping*

Taxpayers must maintain records adequate to substantiate their income, deductions, credits, and other tax attributes.  *See* I.R.C. § 6001.  These records should be sufficient to establish the amount of the gross income or other matters shown on the tax return.  Treas. Reg.

**[\*6]** § 1.6001-1(a). Taxpayers shall retain these records as long as they may become material in the administration of the Code. *Id.* para. (e)

If a taxpayer with inadequate records proves that he incurred a certain expense but cannot substantiate the exact amount, the Court in appropriate circumstances may estimate the amount allowable as a deduction. *See Cohan v. Commissioner*, 39 F.2d at 542–44. The Court is not required to guess at a number; rather, "we must have some basis upon which an estimate may be made." *Polyak v. Commissioner*, 94 T.C. 337, 346 (1990); *see also Vanicek v. Commissioner*, 85 T.C. 731, 743 (1985). In making an estimate under *Cohan*, the Court "bear[s] heavily . . . upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d at 544.

II.    *Analysis*

A.    *Adjusted Basis*

Under section 1001, the gain from the sale of property is the excess of the amount realized over the adjusted basis. Generally, the "basis of property shall be the cost of such property." I.R.C. § 1012(a). Adjustments in the basis of property can be made for expenditures, receipts, losses, or other items properly chargeable to the capital accounts. I.R.C. § 1016(a)(1). Taxpayers may increase their basis in property for costs they incur to improve the property, but they generally bear the burden of proving basis increases they claim. *See* I.R.C. § 1016(a); Rule 142(a); *Chandler v. Commissioner*, 142 T.C. 279, 291 (2014); Treas. Reg. § 1.1016-2(a).

Capital expenditures include, inter alia, "[a]ny amount paid for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Treas. Reg. § 1.263(a)-1(a). The expenditures may include amounts paid to facilitate the acquisition of real property, *see* Treas. Reg. § 1.263(a)-2(f), amounts paid to improve property, *see* Treas. Reg. § 1.263(a)-3, and amounts paid to sell property, *see* Treas. Reg. § 1.263(a)-1(e). Capital improvement expenditures are distinguished from repair and maintenance expenses, which are considered either deductible ordinary and necessary business expenses, *see* I.R.C. § 162, or nondeductible personal, living, and family expenses, *see* I.R.C. § 262. Determining whether an expense is for a repair or routine maintenance, or for an improvement or replacement, is a fact-dependent inquiry. *See* Treas. Reg. § 1.263(a)-3.

**[\*7]**  1.  *Wakefield Property*

Mr. Pesarik claims that the sale of the Wakefield Property produced a capital gain of $55,799, not $187,000 as set forth in the notice of deficiency. He derives this amount by subtracting from the stipulated 2020 sale price of $187,000 (1) a 2016 purchase price of $31,000, (2) improvements of $82,358, and (3) closing costs of $17,843.

We first clear the underbrush, i.e., the purchase price and closing costs. As to the former, the parties stipulated a quitclaim deed that states Mr. Pesarik acquired rights to the Wakefield Property "for $30,000 . . . in consideration paid." Mr. Pesarik has not presented persuasive evidence to support the higher purchase price of $31,000.

With respect to closing costs, the parties stipulated a settlement statement that reflects Mr. Pesarik's payment of closing costs totaling $17,843. The Commissioner did not address this issue at trial or on brief. We conclude that these amounts were incurred to sell the property and thus constituted capital expenses. *See* Treas. Reg. § 1.263(a)-1(e).

We next turn to Mr. Pesarik's claimed capital improvement expenditures. The Commissioner concedes that Mr. Pesarik incurred expenses in improving the Wakefield Property but asserts that the evidence neither substantiates the precise amount claimed nor permits an estimate according to the *Cohan* rule.

The evidence before us does not sufficiently substantiate the amounts that Mr. Pesarik claims as capital improvement expenditures. Mr. Pesarik relies on monthly credit card and bank statements, together with his own testimony, to show the amounts he paid when renovating the Wakefield Property.

This method of proof contains multiple weaknesses, however. With the exception of a few checks bearing the street number of the Wakefield Property, none of the transaction entries in the various account statements directly connect with the Wakefield Property. This lack of connection is particularly problematic as Mr. Pesarik owned a property in Epping throughout, renovated his late mother's house before its sale in March 2017, and testified that he put money into the Hull Property as well. It thus becomes difficult to allocate certain expenditures to the Wakefield Property with much certainty.

Exacerbating the problem is that the credit card statements fail to provide detail regarding the expenditures. By and large the credit

**[\*8]** card statements categorize expenditures by means of broad categories, e.g., "seasonal/garden electrical and lighting," or "paint hardware lumber." These opaque entries shed little light into the items purchased and whether they count as capital improvement expenditures.

Nor does Mr. Pesarik's testimony cure the problem. Like the Commissioner, we find Mr. Pesarik credible in broad strokes: He spent money to renovate the Wakefield Property. We also find credible and specific his testimony regarding several checks made out to electricians and painters in connection with the rehabilitation of the Wakefield Property. But his general testimony regarding the credit card statements, which represent most of the expenditures at issue, was simply too vague and nonspecific to supply the missing link between the charges and the Wakefield Property.

At trial Mr. Pesarik attempted to supply some of the missing ligaments by means of a spreadsheet purporting to allocate capital improvement expenditures (derived from the various statements) between the Wakefield Property and the Hull Property. In addition to the general issues previously discussed, this spreadsheet causes its own set of headaches. First, Mr. Pesarik fails to explain how the allocations were purportedly made, and his testimony engenders little confidence in his ability to do so. Second, the spreadsheet entries conflict with the statements themselves, allocating expenditures to a property before it was purchased or after it was sold and failing to properly reconcile the purchases and credits (from returning items) reflected on the monthly statements.

Although the evidence before us is insufficient for a precise calculation of the capital improvement expenditures for the Wakefield Property, the monthly statements, informed by Mr. Pesarik's testimony, provide an adequate foundation for an estimate under *Cohan*. We will proceed in two stages. First, we will give Mr. Pesarik credit for $6,156 in checks (1) with a legible memorandum reference to the Wakefield Property's street number or (2) made out to Finishing Touches, a painting company about which he credibly testified.

As for the credit card transactions, we will give him credit for one quarter of the total amount spent at Home Depot and at Lowe's reflected on his various cards. We limit our review to identified spending at Home Depot and Lowe's because we have little confidence that the other charges on Mr. Pesarik's credit card statements represent capital

**[*9]** improvement expenditures, rather than nondeductible personal expenses. We derive the fraction consistent with the admonition to "bear[] heavily . . . upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d at 544. Specifically, we reach this number in light of Mr. Pesarik's testimony that he owned four separate properties during the years at issue and made various improvements to these properties. Mr. Pesarik's failure to record his expenditures for each property requires us to discount his Wakefield Property expense allocation, particularly since run-of-the-mill repair and maintenance expenses are not included.

With these guardrails in place, Mr. Pesarik's credit card statements show spending of $59,213 at Home Depot and Lowe's during the time he owned the Wakefield Property. Applying the one quarter fraction, we estimate his capital improvement expenses for the Wakefield Property to be $14,803, from his credit cards. Mr. Pesarik's total capital improvement expenses (including both checks and credit cards) thus equals $20,959.

We accordingly conclude that Mr. Pesarik's sale of the Wakefield Property produced a gain of $118,198 ($187,000 − $30,000 − $17,843 − $20,959 = $118,198).

### 2. *Hull Property*

The parties again stipulated both the purchase price of the Hull Property ($394,750) and Mr. Pesarik's closing costs when he sold it ($24,967).[4] Mr. Pesarik fails to make any argument on brief with respect to capital improvement expenditures for the Hull Property, and we accordingly treat that argument as conceded. The sale of the Hull Property accordingly produced a gain of $137,083 ($556,800 − $394,750 − $24,967 = $137,083).

### B. *Exclusion of Gain Under Section 121*

Gross income means all income from whatever source derived, unless excluded by law. *See* I.R.C. § 61(a); Treas. Reg. § 1.61-1(a). Exclusions from income must be construed narrowly, and taxpayers must bring themselves clearly within the scope of the exclusion. *Gates v. Commissioner*, 135 T.C. 1, 6 (2010) (first citing *Commissioner v.*

---

[4] Although Mr. Pesarik requests on brief that we find closing costs of $26,317, he fails to introduce sufficient support for closing costs in excess of the amount specified as such in the stipulated closing document.

**[\*10]** *Schleier*, 515 U.S. 323, 328 (1995); and then citing *Dobra v. Commissioner*, 111 T.C. 339, 349 n.16 (1998)).

Generally, gain realized on the sale of property is included in a taxpayer's income. I.R.C. § 61(a)(3). Section 121(a) and (b) provides an exclusion from gross income for an individual filer of up to $250,000 of gain from the sale or exchange of property, if the taxpayer has owned and used such property as his or her principal residence for at least two of the five years immediately preceding the sale. The term "principal residence" means "the chief or primary place where a person lives or . . . the dwelling in which a person resides." *Webert v. Commissioner*, T.C. Memo. 2022-32, at \*7 (quoting *Gates*, 135 T.C. at 7).

The question whether a property constitutes a taxpayer's residence is determined with reference to all facts and circumstances. Treas. Reg. § 1.121-1(b)(2); *see also Farah v. Commissioner*, T.C. Memo. 2007-369, 2007 WL 4440980, at \*6. "If a taxpayer alternates between 2 properties, using each as a residence for successive periods of time, the property that the taxpayer uses a majority of the time during the year ordinarily will be considered the taxpayer's principal residence." Treas. Reg. § 1.121-1(b)(2). The Treasury regulation sets forth other factors bearing on this determination, including (i) the taxpayer's place of employment; (ii) the principal place of abode of the taxpayer's family members; (iii) the address listed on the taxpayer's federal and state tax returns, driver's license, automobile registration, and voter registration card; (iv) the taxpayer's mailing address for bills and correspondence; (v) the location of the taxpayer's banks; and (vi) the location of religious organizations and recreational clubs with which the taxpayer is affiliated. *Id.*

Mr. Pesarik fails to carry his burden to show that the Hull Property constituted his principal residence for at least two of the five years immediately preceding its sale in October 2020, as necessary to qualify for the exclusion embodied in section 121(a). We begin with the reminder that the Hull Property was purchased in July 2018, which would require it to be in use as Mr. Pesarik's primary residence essentially from the start.

The record features a dearth of support for that conclusion. Mr. Pesarik owned at least two other properties when he purchased the Hull Property, and he introduced neither evidence consistent with a move to the Hull Property (such as hiring a moving company, renting a cargo van, or buying furniture) nor an explanation for the lack of such

**[\*11]** expenses. Mr. Pesarik likewise provides no information regarding the amount of time he spent at his various properties after his purchase of the Hull Property to corroborate his vague testimony that the Hull Property was his primary residence.

The limited evidence relevant to the factors enumerated in Treasury Regulation § 1.121-1(b)(2) does not weigh in Mr. Pesarik's favor either. According to Mr. Pesarik's testimony, he was not employed during 2018–20, receiving income from his inheritance and disability payments. The record contains no evidence of his siblings' abodes, or the location of religious or recreational groups with which he was affiliated. Mr. Pesarik had an Arizona driver's license, did not file a Massachusetts income tax return for 2018, 2019, or 2020, and used his Portsmouth address on his 2020 federal return and associated forms listed.

We further note that the credit card statements in the record were addressed to Mr. Pesarik's Portsmouth post office box from July 2018 (when he purchased the Hull Property) until January 2020 when some of the statements began to be addressed to either the Hull Property or a Hull post office box address. We observe that within a few months of moving to New Hampshire from Virginia, Mr. Pesarik had updated his mailing address to either his late mother's house or a post office box in Portsmouth, suggesting that Mr. Pesarik did not consider that he had moved to Hull until 2020.

For his part, Mr. Pesarik asserts that the transactions on his credit card statements demonstrate that the Hull Property was his primary residence for the two years before its sale. Although the credit card statements show more activity in Massachusetts during 2018–20 than before he bought the Hull Property (particularly in the summer months), his purchases were not consistently in any one state or locality before, during, or after his purchase of the Hull Property. The wholly inconclusive statements are an unreliable measure of whether the Hull Property was Mr. Pesarik's primary residence, a second home, or a beach house.

Mr. Pesarik attempts to buttress his argument by introducing a purported summary record of his monthly electric bills for the Hull Property from 2018 through 2020. As an initial matter, the summary record fails to disclose the name of the utility, which raises questions about its provenance. Assuming arguendo that the document was a summary of electricity charges, the substance does not help Mr.

**[\*12]** Pesarik's cause. This summary reflects fluctuating monthly charges which Mr. Pesarik sees as demonstrating that the Hull Property was his primary residence. The fact that Mr. Pesarik did not disconnect the electricity during his ownership of the Hull Property has little bearing on whether it was his primary residence or a second home or beach house. Of course, the lower amounts could reflect the baseline of keeping the electricity flowing to the house (even with little usage), while the higher amount might well correspond to periods when he was actually on site.

Finally, Mr. Pesarik asserts that legal difficulties required him to remain in Massachusetts at the Hull Property for multiple months before its sale. Mr. Pesarik fails to adduce any evidence such as court filings that would support his testimony on this point or provide specific periods when he was definitively residing at the Hull Property.

In summary, Mr. Pesarik has not satisfied his burden to show that the Hull Property was his primary residence for at least two years before its disposition. He accordingly is not entitled to exclude the gain from the sale pursuant to section 121(a).

C. *Substantial Understatement Penalty*

The Code imposes a 20% penalty upon the portion of any underpayment of tax required to be shown on a return that is attributable to (among other things) a "substantial understatement of income tax." I.R.C. § 6662(a), (b)(2). Section 6662(d)(2)(A) generally defines "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed. An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. *See* I.R.C. § 6662(d)(1)(A).

The Commissioner has the burden of production on this issue. *See* I.R.C. § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). Mr. Pesarik's 2020 return reported an overpayment of $60. We have found that Mr. Pesarik failed to include $255,281 of income from his 2020 property sales. The Commissioner has plainly met his burden of production to show a "substantial understatement of income tax."[5]

---

[5] The Commissioner's burden of production ordinarily necessitates that he shows compliance with the supervisory approval requirement of section 6751(b).

**[*13]** No penalty is imposed under section 6662 with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]." I.R.C. § 6664(c)(1). "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.* Circumstances that may indicate reasonable cause and good faith include "an honest misunderstanding of fact or law" that is reasonable in light of all of the facts and circumstances, including "the experience, knowledge, and education of the taxpayer." *Higbee*, 116 T.C. at 449 (citing *Remy v. Commissioner*, T.C. Memo. 1997-72).

Mr. Pesarik first suggests that he acted with reasonable cause and in good faith because he believed that he had sold the Wakefield Property at a loss. The record contains no evidence that Mr. Pesarik made any effort to assess his proper tax liability, and his supposition that he took a loss on a sale where he was paid more than six times his purchase price was objectively unreasonable. This conclusion is bolstered by Mr. Pesarik's education and long experience with real property.

Mr. Pesarik also argues that assorted disabilities, including posttraumatic stress disorder, depression, and attention deficit hyperactivity disorder, supply reasonable cause. "Where a taxpayer's disability is raised as part of a reasonable cause defense, we have looked to the severity of the disability and the impact it had on the taxpayer's life . . . ." *Remisovsky v. Commissioner*, T.C. Memo. 2022-89, at *5 (quoting *Jones v. Commissioner*, T.C. Memo. 2006-176, 2006 WL 2423425, at *6). Mr. Pesarik fails to demonstrate that his disabilities interfered with his ability to satisfy his tax reporting obligations or led to the substantial understatement here.

---

Supervisory approval is not required where, as here, the penalty is automatically calculated by electronic means. *See* I.R.C. § 6751(b)(2)(B); *Walquist v. Commissioner*, 152 T.C. 61, 70 (2019).

**[*14]** Mr. Pesarik is thus liable for the section 6662 penalty.

To reflect the foregoing,

*Decision will be entered under Rule 155.*